The water-works in the city of Durham are owned by the municipality and are operated by it under the supervision of the defendant Board of Water Commissioners. Among their employees was one Harvey Bolton, who had general charge and supervision of said water system, and among whose duties it was, assisted by others under his supervision, to keep the books containing the accounts against all customers purchasing water, to render statements to said consumers for the water used by them, and collect all sums due and to give receipts upon payment of said bills.
This is an action by the plaintiff against the city for damages for assault and battery upon him by said Bolton.
The plaintiff, H. Munick, testified: "I live on Poplar Street, and conduct a grocery store. I have been living in Durham eleven years, coming here from New York. I came to New York from Russia, and am a Jew. I am married and have a family of four. I own my home and two more houses and buy water from the city of Durham. On 17 April, 1919, I went to the water company's office, taking a bill which they had sent me for $4.50. No one was with me. I had been there a number of times before and paid my bills. Sometimes I would send the money and pay the bills by the children, and sometimes I would take it myself. This time I took it myself. When I came to the office I saw only the lady who collected. This was in the spring of the year, about twelve o'clock, but I do not recall the day of the week. I do not know the name of the lady, but I took the money and the bills in my hand and handed them to the lady. I took from my pocket three paper dollars, one silver dollar, and fifty cents in pennies, and gave it to the lady with the bills. The fifty cents in pennies was in one package and were not loose. They were rolled up like the bank fixes them. I got the pennies in my retail business. The lady receipted my bills and I put them in my pocket and started to leave the office. I did not go outside of the door, and in about five minutes Mr. Bolton, who is manager of the water company, came in the office. I was standing beside the window, which is the regular place to pay bills when he came in. I had the bills then in my pocket, and the bookkeeper started counting the pennies. Mr. Bolton came in and asked the lady, `What are you counting? nickels or dimes?' She told Mr. Bolton, `Mr. Munick gave me fifty *Page 190 
pennies.' Mr. Bolton then came around the counter inside the office to the desk where she was. I was on the outside by the front door. Mr. Bolton took the pennies and pushed them off the counter onto the floor where I was standing. He was at the back end of the counter and I was at the front, and he pushed all of these pennies on the floor, and came from the inside to where I was and said, `Munick, pick up those pennies. They belong to you.' I said, `Mr. Bolton, those pennies belong to you, not to me.' Mr. Bolton said, `Munick, pick up those pennies; they belong to you.' I told him, `The bill is paid, and those pennies belong to you.' That is all I said to him. I said, `Those pennies are just as good as the dollars.' Mr. Bolton then locked the front door and took me by the jacket and called me `a God-damned Jew,' and said, `Give me back my bills.' I did not say anything, and he hit me in the face. I did not resist, and the door was locked and I could not get out. The pennies were still on the floor. After he slapped me another man came to pay his bill, and Mr. Bolton opened the door and let him in and the man then went out. Mr. Bolton was standing close to me and did not give me a chance to get out. Then I said, `Please turn me loose, I have to go home.' I did not know where the other man was then. When this other man went out Mr. Bolton locked the door again, took me by my jacket and pushed me in the back room, where the tools belonging to the city water company were. I said, `Please turn me loose,' begging him to turn me loose; I do not remember how many times. He did not close the door when he pushed me in the back room. The front door was closed, but not the door in the back room. When he got me in the back room he took his two hands about my neck and choked me. He was standing in front of me and I said, `Please turn me loose; I've got to go home.' He turned me loose for about five minutes, and then took hold of me again, and choked me fast until it interfered with my breathing. It hurt me, and I told him to please turn me loose. When he turned me loose the second time he called to some one to bring a towel. A gentleman brought the towel and he took that towel and put it over my face. This interfered with my breathing, as I could not breathe with it over my face. A little later I told him, `Maybe I got a dollar.' `I will take back the pennies, Mr. Bolton; turn me loose.' I started looking in my pockets, and I found one paper dollar, and said, `I am glad I got one dollar to settle with you.' Mr. Bolton took that dollar and gave me back the fifty pennies. I took them, and Mr. Bolton opened the front door and said, `Get out of here, and don't come no more to pay your water bill.' That is all he said to me, and I left his office. I had been feeling mighty bad. I do not know how long I was in there, but I begged Mr. Bolton to turn me loose, as I was sick and could not stand it. I had some kind of sickness *Page 191 
in my head. I was back there in the office being subjected to this treatment about one-half hour from the time I went in. I went to Mr. Lunsford's office and asked him to phone for me a doctor. I do not know what Mr. Lunsford said. He was busy in his office. I left his office and went home. I used to trade with Mr. Lunsford. I did not see a doctor. The treatment I had received made me sick. When he choked me it hurt me for from eight to ten days. His finger prints where he choked me could be seen on my neck by everybody for eight or ten days. Everybody asked me what was the matter. It made me feel very bad when he cursed me. I had Mr. Bolton indicted, and he was in court and the court found him guilty and fined him. He did not resist. I have Mr. Lunsford, Mr. Speed, and Mr. Draughan for character witnesses."
On cross-examination, he said: "I used to come to this water company's office before this, but had never been treated by any one that way before; and had never heard of any one being treated that way before or after I went there. This is the first time. I put my money on the counter and the young lady took the money and signed my receipt and gave me a receipt, and I put it in my pocket. I paid my bill in full, and all my matters were closed with the city. Mr. Bolton got mad because I paid the pennies. I was on the inside. I got to the door on the inside, and Mr. Bolton locked the door so I could not get out. I have never heard of folks being locked in; that was an unusual sort of thing. I do not know what he did with the key; I could not get out, and did not try. He grabbed hold of me, and I said, `Please turn me loose.' He got madder and madder all the time. I was yelling, and he got the towel to stop me from yelling. The young lady was inside the office while this yelling was going on. She was not doing anything. I do not know who the man was that brought the towel, but he worked in the office. He did not do anything but give the towel to Mr. Bolton, I do not know his name. He was white, and not a very heavy man. I do not know him. I did not try the door. Mr. Bolton opened the door for another man, who paid his water bill, and then Mr. Bolton locked the door again. The man who brought the towel stayed there in the back. He just gave the towel to Mr. Bolton and nothing else. The young lady who I gave the money to did not do anything. She stayed there in the office, looking through the window. She was there while Mr. Bolton was cursing me, where she could hear it. I indicated Mr. Bolton in the recorder's court. He pleaded guilty, and I am suing the city, whose agent he was."
J. O. Lunsford testified that he had known the plaintiff for 12 or 15 years; had sold him flour for several years, and knew his general character, *Page 192 
and it was good. That on the day of this occurrence the plaintiff told him about having this trouble in the water company's office.
A. J. Draughan also testified that he had known the plaintiff 10 or 12 years; that he had sold him goods, and knows his general character, and that it was good.
At the close of the above testimony the defendant offered no evidence, but moved for judgment of nonsuit, which was granted, and the plaintiff appealed.
The testimony for the plaintiff presents one of the most singular occurrences that has come to this Court. The defendant offered no evidence, and the nonsuit was granted on the uncontradicted testimony for the plaintiff, as above set out. It is, therefore, taken as true, with all the inferences from it in the most favorable light to the plaintiff. But indeed there seems to be but one that could be drawn from it. The plaintiff, an old and feeble man, went to the water company on receiving a notice sent by it to pay his bill. He handed the clerk the money, and she gave him a receipt. A part of the payment was fifty "pennies," that is, one-cent pieces, wrapped up together. While he was standing there and she was counting the pennies, the manager of the water company came in, knocked the pennies off the counter on the floor, cursed the plaintiff, calling him a "G___d-d___n Jew," told him to pick up the pennies, struck him, pulled him into another room, struck him repeatedly, interrupted this to admit another patron, and after the latter went out, the superintendent resumed his beating of the plaintiff, who offered no resistance, and begged to be turned loose to go home, shook him, choked him, put a towel over his face, suffocating him, and finally when the plaintiff tendered a dollar bill he told him to take his pennies and to leave and not come back.
The official (Bolton) was indicted in the criminal court and convicted and merely fined. Taking this occurrence to be as stated by the plaintiff, who is not contradicted and who proved a good character, a more brutal and unprovoked assault could not be presented. It was absolutely without justification. The pennies, under the United States statute, were a legal tender to the amount of 25 cents, U.S. Compiled Statutes, 1918, sec. 6574, and if the clerk had objected the water company could not have been compelled to receive beyond that sum in pennies, but it was no offense to tender a larger sum in one cent pieces, and the lady clerk accepted them, and even if the tender of fifty of them was for any reason objectionable (which does not appear), it certainly did not justify the treatment the plaintiff received. *Page 193 
There is no explanation of the conduct of the company's superintendent, and the only provocation given which we can infer from the language used by Bolton is the fact that the plaintiff was a Jew. He made no other charge. The treatment which the plaintiff received is paralleled by that which is portrayed by Scott in Ivanhoe in the treatment of Isaac of York seven centuries ago, and by Shakespeare as meted out to Jews in the Merchant ofVenice, also centuries ago. The world has long outlived this treatment of an historic race, except perhaps in "darkest Russia," when under the Czars.
When Disraeli, later Prime Minister of the British Empire, was reproached in Parliament for being a Jew, he made the memorable reply, "When the ancestors of the right honorable gentleman were painted savages roaming naked in the forests of Germany, my ancestors were princes in Israel and High Priests in the Temple of Solomon."
Every voter, every witness, and every official takes an oath upon a sacred Book, every sentence and word in which was written by a Jew. When the Savior was incarnated, after the flesh he was of the tribe of Judah, and His mother, whom a great church holds immaculate, if not divine, has her name borne by millions throughout the civilized world. Whatever the shortcomings of any individual, it is strange that in this day of enlightenment such prejudices as were shown in this case should survive against the race to which the plaintiff belongs. This plaintiff proved without contradiction a good character, and certainly there is no evidence which justified in any degree the brutal assault made upon him for which no excuse is offered. For some unexplained reason the brutal assailant, though convicted, was punished only by a fine. It is to be presumed, however, that the city discharged him from its service.
The ground upon which the nonsuit was asked and allowed, as presented in this Court, is that the defendants, and the city of Durham, are not responsible for the act of its agent, Harvey Bolton, superintendent of the water-works, or that, at least, in making the assault he was not within the scope of his authority in that he had no instructions from the defendants to commit such violence. At the time that the assault was made by the said Harvey Bolton, he was acting in his capacity as agent. Had he been acting for a water company under private ownership it could not be contended that the corporation would not be responsible. He was there in the prosecution and furtherance of the duties assigned to him by the defendant municipality. Roberts v. R. R., 143 N.C. 179. Indeed, the facts are very similar to those in Bucken v. R. R., 157 N.C. 443, "Acting within the scope of employment means while on duty." Cook v. R. R., 128 N.C. 336.
In Ange v. Woodmen, 173 N.C. 33, it is said: "It is now fully established that corporations may be held liable for negligence and malicious *Page 194 
torts, and the responsibility will be imputed whenever such wrongs are committed by their employees and agents in the course of their employment and within its scope. . . . In many of the cases and in reliable text-books `course of employment' is stated and considered as sufficiently inclusive, but whether the one or the other descriptive term is used, they have the same significance in importing liability on the part of the principal when the agent is engaged in the work that its principal has employed or directed him to do, and in the effort to accomplish it. When such conduct comes within the description that constitutes an actionable wrong, the corporation principal, as in other cases of principal and agent, is liable not only for the act itself, but for the ways and means employed in the performance thereof." In 1 Thompson Negligence, sec. 554, it is pointed out that unless the above principle is maintained, "It will always be more safe and profitable for a man to conduct his business vicariously than in his own person. He would escape liability for the consequences of many acts connected with his business springing from the imperfections of human nature, because done by another for which he would be responsible if done by himself. Meanwhile, the public, obliged to deal or come in contact with his agent, for injuries done by them must be left wholly without redress. He might delegate to persons pecuniarily irresponsible the care of large factories, of extensive mines, of ships at sea, or of railroad trains on land, and these persons, by the use of the extensive power thus committed to them, might inflict wanton and malicious injuries on third persons, without other restraint than that which springs from the imperfect execution of the criminal laws. A doctrine so fruitful of mischief could not long stand unshaken in an enlightened jurisprudence." This Court has often held the master liable, even if the agent was willful, provided it was committed in the course of his employment. Jackson v. Tel. Co.,139 N.C. 347.
Indeed, the doctrine goes further, and the principal is liable if one coming on the premises in connection with business dealings, or by invitation, is assaulted by one of its agents. This is settled by the leading case of Daniel v. R. R., 117 N.C. 592, and the numerous citations to the case in the Anno. Ed. Indeed, the same ruling has been uniformly made, and was reaffirmed at this term in Clark v. R. R., ante, 110.
Not only is the corporation liable for injuries thus committed by its agents, but "it is the duty of a carrier to protect its passengers from injury, insults, violence, and ill-treatment from its servants, other passengers, or third persons." Seawell v. R. R., 132 N.C. 859, citing numerous cases. Indeed, as far back as 1883, Ruffin, J., in Britton v. R.R., 88 N.C. 544, in terms ever since deemed settled law, said: "The carrier owes to the passenger the duty of protecting him from violence and assaults of other passengers and intruders, and will be *Page 195 
responsible for his own or his servants' negligence in this particular, when by the exercise of proper care the acts of violence might have been foreseen and prevented." This is cited with approval in Seawell v. R. R.,supra. The same rule applies to any other corporation. In that case the passenger was assaulted by a mob, and the defendant was held liable because "four employees were present and it was shown that none of them made the slightest attempt to protect the plaintiff, and indeed there was evidence that two of them actively participated in, or at least encouraged the assault." This case was reheard and reaffirmed, 133 N.C. 517, the Court saying: "A careful examination of all the authorities shows no case, and the appellants cite none, that under similar circumstances the railroad company has not been held liable, unless it exerted whatever power it could to protect the passenger from the mob," . . . adding, "The cases are uniform, fastening liability upon a common carrier for failure to exert such protection as it could to a passenger against a mob," citing numerous cases.
That the corporation is liable for the mistreatment of one invited upon its premises, as this plaintiff was, or even if it fails to protect him as far as it can from violence by others while upon its premises, is beyond controversy. Indeed, the principle is so well settled that it needs no citation of authority.
We apprehend, however, that his Honor did not nonsuit the plaintiff upon any views to the contrary, but doubtless upon the ground that the city was not liable. That contention by the defendant is equally untenable. InMcIlhenney v. Wilmington, 127 N.C. 149, it is said: "The law is too well settled to admit of debate. It may, on review of the authorities, which are uniform, be thus stated: When cities are acting in their corporate character, or in the exercise of powers for their own advantage, they are liable for damages caused by the negligence or torts of their officers or agents; but where they are exercising the judicial, discretionary, or legislative authority conferred by their charters or are discharging their duty solely for the public benefit, they are not liable for the torts or negligence of their officers, unless there is some statute which subjects them to liability therefor," citing numerous cases. The distinction is very broad and clear, and is settled by all the authorities substantially as follows: Wherever a city is exercising a governmental function, or police power, it is not responsible for the torts or negligence of its officers in the absence of a statute imposing such liability; but when it is acting in its business capacity, as in operating a water or lighting plant or other business function, it is liable for the conduct of its agents and servants exactly to the same extent that any other business corporation would be liable under the same circumstances. The distinction thus laid down inMcIlhenney v. Wilmington, supra, has been often cited with approval. *Page 196 
To sum up: The assault upon the plaintiff was of the most brutal and unprovoked nature. Indeed there is no evidence set up in this case that tends to palliate or mitigate the assault, which, it appears, was entirely unprovoked. There is no question that Bolton was the officer of the corporation, and was acting in the discharge of his duty, and that the plaintiff was on the premises at the invitation of the corporation; and further, it was the duty of the corporation not only to refrain from assaulting or injuring the plaintiff while there, but to protect him from any violence which it could reasonably have foreseen if offered by others; and still further, the city operating the water plant in its business capacity and not under its governmental or police power, on these facts the same liability was imposed upon the city as if it were a business plant.
The judgment entering a nonsuit must be
Reversed.