**Corene Antoinette LYON, Appellant,**

v.

**Michael CAREY et al.**

**No. 74–1942.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1975.

Decided March 3, 1976.

Rehearing Denied May 3, 1976.

---

Leonard L. Lipshultz, Silver Spring, Md., with whom John Llewellyn Hone and Stanley L. Lipshultz, Silver Spring, Md., were on the brief for appellant.

Joseph S. McCarthy, Washington, D. C., for appellees George's Radio and Television Co. Inc. and Pep Lines Trucking Co.

Before LEVENTHAL and MacKINNON,* Circuit Judges, and McMILLAN,** United States District Judge for the Western District of North Carolina.

Opinion for the Court filed by District Judge McMILLAN.

McMILLAN, District Judge:

Corene Antoinette Lyon, plaintiff, recovered a $33,000.00 verdict in the United States District Court for the District of Columbia before Judge Barrington T. Parker and a jury, against the corporate defendants, George's Radio and Television Company, Inc., and Pep Line Trucking Company, Inc. The suit, for damages, arose out of an assault, including rape, committed with a knife and other weapons upon the plaintiff on May 9, 1972, by Michael Carey, a nineteen-year-old deliveryman for Pep Line Trucking Company, Inc. Three months after the trial, Judge Parker set aside the verdict and rendered judgment for both defendants notwithstanding the verdict. Plaintiff appealed.

As to the defendant Pep Line Trucking Company, Inc., we reverse the district

---

* Circuit Judge MacKinnon did not participate in the decision of this case.

** Sitting by designation pursuant to 28 U.S.C. § 292(d).

court's judgment and reinstate the verdict. Although the assault was perhaps at the outer bounds of *respondeat superior*, the case was properly one for the jury. It is within the enterprise liability of vendors like furniture stores and those who deliver for them that deliverymen, endeavoring to serve their masters, are likely to be in situations of friction with customers, and that when they secure entry into a customer's premises by means of a badge of employment, these foreseeable altercations may precipitate violence for which recovery may be had, even though the particular type of violence was not in itself anticipated or foreseeable. Whether the assault in this case was the outgrowth of a job-related controversy or simply a personal adventure of the deliveryman, was a question for the jury. This was the import of the trial judge's instructions. The verdict as to Pep Line should not have been disturbed.

Plaintiff was twenty-five years old, an employee of the D. C. Metropolitan Police Department. She is a twin sister of Irene Yvette Lyon, whose home was in an apartment at 5218 Fifth Street, S. E., in the District of Columbia. Irene Yvette Lyon had bought a mattress and springs for her bed from the defendant George's Radio and Television Company, Inc. The merchandise was to be delivered on May 9, 1972. Irene Lyon had to be at work and the plaintiff, Corene Lyon, had agreed to wait in her sister's apartment to receive the delivery.

A C.O.D. balance of $13.24 was due on the merchandise, and Irene Lyon had left a check for $13.24 to cover that balance. Plaintiff had been requested by her sister to "wait until the mattress and the springs came and to check and make sure they were okay."

Plaintiff, fully clothed, answered the door. Her description of what happened is sufficiently brief and unqualified that it will bear repeating in full. She testified, without objection, as follows:

"A. I went to the door, and I looked in the peephole, and I asked who was there.

The young man told me he was a delivery man from George's. He showed me a receipt, and it said, 'George's.' He said he couldn't take a COD, so I let him in, and I told him to bring the mattress upstairs and he said, 'No,' that he wasn't going to lug them upstairs, and he wanted the COD first, and I told him I wanted to see the mattress and boxsprings to make sure they were okay, and he said no, he wasn't going to lug them upstairs.

So this went back and forwards and so he was getting angry, and I told him to wait right here while I go get the COD.

I went to the bedroom to get the check, and I picked it up, and I turned around and he was right there.

"Q. Keep on.

"A. And then I was giving him the check and then he told me that his boss told him not to accept no check, that he wanted cash money, and that if I didn't give him cash money, he was going to take it on my ass, and he told me that he was no delivery man, he was a rapist and then—

"THE COURT: Talk a little louder, young lady. Just a second. The ladies over in the jury box are raising their hands indicating that they are unable to hear you.

"BY THE COURT:

"Q. Now you say there came a time when he said he could not take any check?

"A. His boss only told him to accept cash.

"Q. All right. Now turn your head toward the ladies and gentlemen of the jury, and relate what happened after that.

"A. And then he told me that his boss wanted him only to accept cash, that he could not take any checks, and then he said that if I don't give him cash money, he was going to take it out of my ass, and then he threw me on the bed.

"Q. Talk louder, young lady.

"A. And then he threw me on the bed, and he had a knife to my throat.

"Q. Then what happened?

"A. And then he raped me."

Plaintiff's pre-trial deposition was a part of the record on appeal, and it shows that Carey raped plaintiff at knife point; that then he chased her all over the apartment with a knife and scissors and cut plaintiff in numerous places on her face and body, beat and otherwise attacked her. All of the physical injury other than the rape occurred after rather than before the rape had been accomplished.

Carey was tried for rape, pleaded guilty, and was sentenced to an active term in prison. Although he was named as a defendant, no one bothered to procure service of process upon him. Because Carey is not even a party, no question is presented on this appeal as to his liability.

Carey was an employee of the defendant Pep Line Trucking Company, Inc. Pep Line had an independent contract arrangement to make deliveries for George's Radio and Television Company, Inc. Carey was not an employee of George's. Carey was on the Lyon apartment premises for the purpose of delivering the mattress and springs which plaintiff's sister had bought from George's. Carey had the delivery receipt, and obtained entrance into the apartment upon the basis that he was making the delivery for George's. Plaintiff did not release the door chain until Carey displayed the George's delivery receipt.

As to the defendant Pep Line Trucking Company, Inc., the evidence will not support a finding that Pep Line knew or should have known that Carey had any proclivity or history more pronounced than that of any other nineteen-year-old boy for assaults, sexual or otherwise which would make Pep Line liable because of knowledge of a dangerous propensity.

The principal question, therefore, is whether the evidence discloses any other basis upon which a jury could reasonably find Pep Line, the employer of Carey, liable for the assault.

Michael Carey was in the employment of the defendant Pep Line as a deliveryman. He was authorized to make the delivery of the mattress and springs plaintiff's sister had bought. He gained access to the apartment only upon a showing of the delivery receipt for the merchandise. His employment contemplated that he visit and enter that particular apartment. Though the apartment was not owned by nor in the control of his employer, it was nevertheless a place he was expected by his employer to enter.

After Carey entered, under the credentials of his employment and the delivery receipt, a dispute arose naturally and immediately between him and the plaintiff about two items of great significance in connection with his job. These items were the request of the plaintiff, the customer's agent, to inspect the mattress and springs before payment (which would require their being brought upstairs before the payment was made), and Carey's insistence on getting cash rather than a check.

The dispute arose out of the very transaction which had brought Carey to the premises, and, according to the plaintiff's evidence, out of the employer's instructions to get cash only before delivery.

On the face of things, Pep Line Trucking Company, Inc. is liable, under two previous decisions of the Court of Appeals for the District of Columbia Circuit. *Tarman v. Southard*, 92 U.S.App.D.C. 297, 205 F.2d 705 (1953) held a taxi owner liable for damages (including a broken leg) sustained by a customer who had been run over by the taxi in pursuit of a dispute between the driver and the customer about a fare. *Dilli v. Johnson*, 71 U.S.App.D.C. 139, 107 F.2d 669 (1939), held a restaurant owner liable to a restaurant patron who was beaten with a stick by one Propst, a restaurant employee, after a disagreement over the service. The theory of *Dilli*, 71 U.S.App.D.C. 139, 107 F.2d at 670, was that:

"It is well established that an employer may be held responsible in tort for assaults committed by an employee while he is acting within the scope of his employment, even though he may act wantonly and contrary to his employer's in-

structions. *Axman v. Washington Gaslight Co.*, 38 App.D.C. 150; *Davis v. Merrill*, 133 Va. 69, 112 S.E. 628; see *New York Central & H. R. R. Co. v. United States*, 212 U.S. 481, 493, 29 S.Ct. 304, 53 L.Ed. 613.

\*   \*   \*   \*   \*   \*

". . . having placed Propst in charge and committed the management of the business to his care, defendants may not escape liability either on the ground of Propst's infirmity of temperament or because, under the influence of passion aroused by plaintiff's threat to report the circumstances, he went beyond the ordinary line of duty and inflicted the injury shown in this case. *Davis v. Merrill*, 133 Va. 69, 112 S.E. 628."

*Munick v. City of Durham*, 181 N.C. 188, 106 S.E. 665 (Supreme Court of North Carolina, 1921), though not a binding precedent, is informative and does show that the theory of liability advanced by the plaintiff is by no means recent in origin. The plaintiff, Munick, a Russian born Jew, testified that he went to the Durham, North Carolina city water company office on April 17, 1919, and offered to pay his bill with "three paper dollars one silver dollar, and fifty cents in pennies." The pennies were in a roll "like the bank fixes them." The clerk gave a receipt and the plaintiff prepared to leave the office. The office manager came into the room, saw the clerk counting the pennies, became enraged at the situation, shoved the pennies onto the floor and ordered Munick to pick them up. Bolton, the manager,

"locked the front door and took me by the jacket and called me 'God damned Jew,' and said, 'Give me back my bills.' I did not say anything and he hit me in the face. I did not resist, and the door was locked and I could not get out. . . ."

With the door locked, Bolton then repeatedly choked and beat the plaintiff, finally extracted a bill in place of the pennies, and ordered him off the premises with injuries including finger marks on his neck that could be seen for eight or ten days. Bolton was convicted of unlawful assault.

The North Carolina Supreme Court (Clark, C. J.) reversed the trial court's dismissal and held that the case should have gone to the jury. The court, quoting other sources, said (at 181 N.C. 193–94, 106 S.E. 667–68):

"It is now fully established that corporations may be held liable for negligent *and malicious* torts, and that responsibility will be imputed whenever such wrongs are committed by their employees and agents in the course of their employment and within its scope \* \* \* in many of the cases, and in reliable textbooks \* \* 'course of employment' is stated and considered as sufficiently inclusive; but, whether the one or the other descriptive term is used, they have the same significance in importing liability on the part of the principal when the agent is engaged in the work that its principal has employed or directed him to do and \* \* \* in the effort to accomplish it. When such conduct comes within the description that constitutes an actionable wrong, the corporation principal, as in other cases of principal and agent, is liable not only for 'the act itself, *but for the ways and means employed in the performance thereof.*' (Emphasis added.)

"In 1 Thompson, Negligence, § 554, it is pointed out that, unless the above principle is maintained:

" 'It will always be more safe and profitable for a man to conduct his business vicariously than in his own person. He would escape liability for the consequences of many acts connected with his business, springing from the imperfections of human nature, because done by another, for which he would be responsible if done by himself. Meanwhile, the public, obliged to deal or come in contact with his agent, for injuries done by them must be left wholly without redress. He might delegate to persons pecuniarily irresponsible the care of large factories, of extensive mines, of ships at sea, or of railroad trains on land, and these persons, by the use of the extensive power thus committed to them, might inflict wanton

and malicious injuries on third persons, without other restraint than that which springs from the imperfect execution of the criminal laws. A doctrine so fruitful of mischief could not long stand unshaken in an enlightened jurisprudence.'

"This court has often held the master liable, even if the agent was willful, provided it was committed in the course of his employment. *Jackson v. Tel. Co.*, 139 N.C. 347, 51 S.E. 1015, 70 L.R.A. 738."

*Grimes v. Saul*, 60 App.D.C. 47, 47 F.2d 409 (1931), does not require a different result. In that case the defendant Saul Company, an owner of real estate, was held not liable for an attempted rape committed one afternoon in the building by a janitor on a tenant. A demurrer to the complaint was sustained because there was no allegation that the assault arose out of any business being transacted or any duty being performed for the employer, or that the janitor in committing the assault had any motive whatever connected with the business of the employer, the only intent alleged being simply the assault with the personal intent to commit rape. The case was decided upon the basis that

> "The act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor. In these circumstances the servant alone is liable for the injury inflicted." 39 C.J. p. 1295.

\*     \*     \*     \*     \*     \*

> ". . . The general idea is that the employee at the time of doing the wrongful act, in order to fix liability on the employer, must have been acting in behalf of the latter and not on his own account." 18 R.C.L. pp. 796, 797." (p. 410)

The principal physical (as opposed to psychic) damage to the plaintiff is a number of disfiguring knife wounds on her head, face, arms, breasts and body. If the instrumentalities of assault had not included rape, the case would provoke no particular curiosity nor interest because it comes within all the classic requirements for recovery against the master. The verdict is not attacked as excessive, and could not be excessive in light of the physical injuries inflicted.

It may be suggested that *Dilli v. Johnson* and *Munick v. Durham* are distinguishable because in each of those cases the plaintiff was a business visitor on the defendant's "premises." This might be a serious distinction if the controlling element of those cases was that the events occurred on the premises. This does not, however, appear to be their rationale. Though they do attach some significance to the "premises" idea, that is not the controlling element. To the contrary, *Dilli* and *Munick*, as well as *Tarman v. Southard*, are decided on the basis that a master is liable for an assault *arising out of*, and committed *in the course of* the employment, even though it is accompanied by or motivated in part by emotions of passion, savagery or personal revenge.

If, however, "premises" is thought to be significant, the premises of a deliveryman may fairly include the places where he goes to make deliveries, *Davis v. J. & B. Motor Lines*, 193 Tenn. 233, 245 S.W.2d 769 (1951) (A contractor's premises include the highway, when his business is hauling freight.); *see Babine v. Cane Const. Corp.*, 153 Me. 339, 138 A.2d 625 (1958) (When a contractor takes his employees onto the premises of another, to perform the contract, such premises become the *contractor's* premises.); *Ganassi v. Pittsburgh Coal Co.*, 162 Pa.Super. 289, 57 A.2d 717 (1948) (A public way may be the premises of an employer.).

Home delivery customers are usually in their homes, sometimes alone; and deliveries of merchandise may expose householders to one-on-one confrontations with deliverymen. It would be a strange rule indeed which, while allowing recovery for assaults committed in "the store," would deny a master's liability for an assault committed on a lone woman in her own home, by a deliveryman required by his job to enter the home.

As to "common carrier" as a possible rationale of *Tarman*, the Court of Appeals for the District of Columbia Circuit seems already to have recognized that it is the situation rather than the geography which is important; how else could it have been held that one was still in the status of a *passenger* when he was wilfully run down by a taxi which he had already vacated? One need not be critical of the *Tarman* result to believe that the court was, as the court should now be, willing to decide cases on substance rather than form.

 If, as in *Grimes v. Saul, supra*, the assault was not motivated or triggered off by anything in the employment activity but was the result of only propinquity and lust, there should be no liability.

However, if the assault, sexual or otherwise, was triggered off or motivated or occasioned by a dispute over the conduct—then and there—of the employer's business, then the employer should be liable.

■ It is, then, a question of fact for the trier of fact, rather than a question of law for the court, whether the assault stemmed from purely and solely personal sources or arose out of the conduct of the employer's business; and the trial judge so instructed the jury.

It follows that, under existing decisions of the District of Columbia Circuit, plaintiff has made out a case for the jury against Pep Line Trucking, Inc.

—unless the sexual character of *one* phase of the assault bars her from recovery for damages from all phases of the assault.

We face, then, this question: Should the entire case be taken from the jury because, instead of a rod of wood (as in *Dilli*), *in addition* to weapons of steel (as in *Tarman*); and *in addition* to his hands (as in *Munick*), Carey also employed a sexual weapon—a rod of flesh and blood—in the pursuit of a job-related controversy?

The answer is, No. It is a jury's job to decide how much of plaintiff's story to believe, and how much if any of the damages were caused by actions, including sexual assault, which stemmed from job-related sources rather than from purely personal origins.

■ As to the defendant George's, although the theory of independent contract as a defense is not totally consistent with the principles of liability which we follow here, we are not persuaded on these facts, including Pep Line's agreement to indemnify George's, that the trial judge erred in setting aside the verdict.

The judgment is affirmed as to the defendant George's and reversed as to the defendant Pep Line Trucking Company, Inc.