The PENN CENTRAL TRANSPORTA-
TION COMPANY, Appellant,

v.

Arthur Z. REDDICK and Marie Lucille
Reddick, Appellees.

No. 12942.

District of Columbia Court of Appeals.

Argued Oct. 10, 1978.

Decided Feb. 15, 1979.

Daniel V. S. McEvily, Washington, D. C., for appellant.

David Epstein, Washington, D. C., with whom Janis M. Goldman, Washington, D. C., was on the brief, for appellees.

Before NEWMAN, Chief Judge, and YEAGLEY and KERN, Associate Judges.

NEWMAN, Chief Judge:

Appellant, a corporation seeks reversal of a special jury verdict holding it vicariously liable for an intentional tort committed by its employee, and awarding appellees $500,-000.[1] Appellant asserts that the trial court erred in permitting the jury to determine that the employee was within the scope of his employment at the time of this tort. We hold that as a matter of law the employee's conduct was outside the scope of his employment and thus, we reverse.

On January 7, 1973, Frederick Jones was an employee of appellant, Penn Central. He was called to duty from the "extra board"—a roster of men available to fill job vacancies due to sickness, leave, etc. of other employees—to serve as brakeman on a northbound Penn Central train to New Jersey. The crew began service at 9 p. m. on January 7 at Potomac Yard in Alexandria, Virginia. The crew went off duty at 7:30 a. m., January 8 at "The Meadows" in New Jersey. They were released from further work assignments and were told to deadhead[2] to Washington on the 8:50 a. m. Amtrak train No. 61. The train would take Jones to Washington, and he would then take a cab to Potomac Yard. If he did not desire to complete the entire trip to Washington, he was not obliged to, but was still paid as if he completed the trip. Jones did not take the assigned train at 8:50 a. m. Rather, he "marked off" duty and remained in New Jersey until approximately 6 p. m. when he took a train that arrived in Washington at 10 p. m. on January 8. Under federal law,[3] he could not become available to work another assignment until eight hours had passed from the expected time of arrival on the assigned train. Thus, he could not have received another assignment until approximately 8:30 p. m. on January 8. In order for Jones to be given another assignment, he would have had to call the Benning Road yard, where the "extra board" was located, and inform the dispatcher that he was requesting a further assignment. There was no evidence that he had made such a call.

---

1. Appellees filed a motion for remittitur, which the court granted, reducing the award to $300,-000.

2. Deadhead is a term denoting full pay for travelling as a passenger to the original point of departure.

3. Hours of Service Law, 45 U.S.C. 61–64b (1970).

Upon leaving Union Station, Jones encountered appellee, Arthur Reddick, a cab driver who had stopped at Union Station to use the rest room facilities. Jones, at the time, was wearing work clothes, railmen's steel-toed boots and carrying a lantern. The altercation between the two men was started by Jones. Reddick's testimony about the altercation is uncontradicted since Jones did not appear at trial. The testimony suggests that, from the moment Jones approached Reddick seeking transportation, Jones' manner was abusive and his speech was littered with expletives and racial epithets. Reddick said that he was going to the men's room but afterward he would take Jones to his destination. Following more heated words, Reddick testified that Jones told him to "Go on to the men's room." As Reddick turned to go he heard Jones running up behind him. Jones kicked him on the leg and continued kicking Reddick with his steel-toed boot as he lay on the floor, shattering his right leg. Jones was subsequently arrested and pleaded guilty to assault.

At trial, Jones' supervisor on this trip, Freight Conductor R. W. Johnson, testified that he could only think of two reasons why Jones would have wanted to go to Potomac Yard—to get his car, or to start a new job. Johnson further testified, however, that when the crew had arrived in New Jersey, he had called and determined that there was no "extra board" work available for his crew to commence after 8:30 p. m. on January 8 (the first time the crew would have been available for duty pursuant to federal law). There was no evidence that Jones was in fact traveling from Union Terminal to Potomac Yard for the purpose of commencing an "extra board" trip. Indeed, the record even is devoid of evidence that there was a train leaving Potomac Yard the night of the 8th after 8:30 p. m. which needed a brakeman from the "extra board".

At the close of the plaintiffs' case and again at the end of all the evidence, appellant moved for a directed verdict which was denied. After the jury verdict, appellant moved for judgment notwithstanding the verdict which also was denied. The

grounds for these motions were that while the evidence showed that Jones was in Penn Central's general employ, the assault was not within the scope thereof.

I

■■■ *Respondeat superior* is a doctrine of vicarious liability and allows the employer to be held liable for the acts of his employees committed within the scope of their employment. *See, e. g., Great A&P Tea Co. v. Aveilhe,* D.C.Mun.App., 116 A.2d 162, 164 (1955); *Park Transfer Co. v. Lumbermens Mutual Casualty Co.,* 79 U.S.App. D.C. 48, 48, 142 F.2d 100, 100 (1944), quoting *Washington Gas-Light Co. v. Lansden,* 172 U.S. 534, 544, 19 S.Ct. 296, 43 L.Ed. 543 (1899). The mere existence of the master and servant relationship is not enough to impose liability on the master. The boundaries of liability extend only as far as the servant is acting within the scope of his employment. *See, e. g., Western Union Telegraph Co. v. Scrivener,* 57 App.D.C. 120, 122, 18 F.2d 162, 164 (1927).

■■■ The words "scope of employment" have no precise legal meaning and thus, the determination of scope of employment is dependent upon the facts and circumstances of each case. Nevertheless, a general rule emerges that

whatever is done by the employee in virtue of his employment and in furtherance of its ends is deemed by the law to be an act done within the scope of his employment, and that, in determining whether the servant's conduct was within the scope of his employment, it is proper to inquire whether he was at the time engaged in serving his master. [57 C.J.S. *Master and Servant* § 570d(2), at 303 (1948) (footnotes omitted).]

"However, if the employee's departure from his master's business is of such a marked and decided character," *Greater A&P Tea Co. v. Aveilhe, supra* at 164, then the employer is no longer responsible. *See Axman v. Washington Gaslight Co.,* 38 App.D.C. 150, 158 (1912). Once the "agent turns aside from the business of the principal and

commits an independent trespass, the principal is not liable. The agent is not then acting within the scope of his authority in the business of the principal, but [acting] in the furtherance of his own ends." *Id.* This type of departure is considered a complete abandonment of the master-servant relationship. *See generally,* Y. B. Smith, *Frolic and Detour,* 23 Colum.L.Rev. 444, 716 (1923). But, if the departure is slight, the relationship is not broken and the employer remains liable. *See Garriepy v. Ballou & Nagle, Inc.,* 114 Conn. 46, 49–50, 157 A. 535, 536–37 (1931).[4]

Courts have propounded a theory termed "enterprise risk" to help determine whether an employee at the time of the tort is within the scope of his employment. This theory uses a foreseeability test and finds that the employer "cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of [his business] activities." *Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167, 171 (2d Cir. 1968). The issue, then, becomes whether the conduct in question is "so 'unforeseeable' as to make it unfair to charge the [employer] with responsibility." *Id.* Thus, "we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise." *United States v. Romitti,* 363 F.2d 662, 666 (9th Cir. 1966), quoting 2 Harper and James, Law of Torts § 26.7 at 1377 (1956). *See International Distributing Corp. v. American District Telegraph Co.,* 186 U.S.App.D.C. 305, 569 F.2d 136 (1977); *Lyon v. Carey,* 174 U.S.App.D.C. 422, 533 F.2d 649 (1976).

A servant is generally not within the scope of his employment when he "punish[es] persons who annoy him in the performance of the service." *Park Transfer*

Co. *v. Lumbermens Mutual Casualty Co., supra* at 48–49 n.3, 142 F.2d at 100–01 n.3, quoting 2 Mechem, Agency § 1978 at 1540 (2d ed. 1914). But if the tort "was the outgrowth of a job-related controversy," *International Distributing Corp. v. American District Telegraph Co., supra,* 186 U.S.App. D.C. at 308, 569 F.2d at 139, quoting *Lyon v. Carey, supra,* 174 U.S.App.D.C. at 424, 533 F.2d at 651, then the employer remains liable, since the master and servant relationship is not broken.

Traditionally, courts held the master liable for any unintentional tort committed while the employee was furthering the master's purposes, and at the same time held the master liable for only those intentional torts of the servant committed in the furtherance of the master's purposes and specifically commanded, or authorized by the master. Harper and James, *supra* § 26.9 at 1389; W. Prosser, Law of Torts § 70 at 464 (4th ed. 1971). *See, e. g., Mali v. Lord,* 39 N.Y. 381 (1868); *Wright v. Wilcox,* 19 Wend. 343 (N.Y.1838).

There had been a gradual retreat from the requirement that intentional torts must have been specifically authorized. However, courts still insisted that the master's affairs were being furthered by the employee's conduct. Thus, even when the injury occurred in a quarrel that arose out of the employment, if the master's affairs were not being furthered by the servant, then courts generally limited the master's liability. Harper and James, *supra* § 26.9 at 1392; W. Prosser, *supra* at 465–66. *See, e. g., Johnson v. M. J. Uline Co.,* D.C.Mun. App., 40 A.2d 260 (1945); *Georgia Power Co. v. Shipp,* 195 Ga. 446, 24 S.E.2d 764 (1943); *Plotkin v. Northland Transportation Co.,* 204 Minn. 422, 283 N.W. 758 (1939).

---

4. Both courts and legal scholars have used the rubric frolic to denote a substantial departure from the master's business that breaks the master and servant relationship, and the rubric detour to denote a slight departure from the master's business that does not suspend the master's liability for his servant's act, leaving the master and servant relationship intact.

A number of factors have been considered important in determining whether the deviation is a frolic or detour. These factors include (1) the time and place of the deviation; (2) its extent with relation to the prescribed route; (3) whether its motivation is in part to serve the master; and (4) whether it is a usual sort of deviation for servants on such a job. The weight of each of these factors varies with the circumstances of each case. 2 Harper and James, Law of Torts § 26.8 at 1383 (1956).

Courts looked to the type of duties that the servant was to perform. When "the servant was not engaged in an employment calling for the use of force against others and . . . there was no antecedent likelihood that an assault would be committed," Harper and James, *supra* § 26.9 at 1390, quoting Seavy, Studies in Agency § 254 (1949), then the master was not held liable. *See also* Restatement (First) of Agency § 245 at 547–51 (1933), (especially Comment d). Therefore, when "the servant's wrong comes from personal spite or malice not engendered by anything connected with the employment," Harper and James, *supra* § 26.9 at 1391–92, the servant was outside the scope of his employment and the employer was not liable.

■ The present trend is to extend liability for intentional torts to situations where the employment provides a "peculiar opportunity and . . . incentive for such loss of temper," W. Prosser, *supra* at 466, as where an argument is likely by virtue of the servant's duties, and the conduct is wholly or partially in furtherance of the master's business. *See* W. Prosser, *supra* at 464.[5]

It is now fully established that corporations may be held liable for negligent *and malicious* torts, and that responsibility will be imputed whenever such wrongs are committed by their employees and agents in the course of their employment and within its scope . . . . [T]hey . . . [impute] liability on the part of the principal when the agent is engaged in the work that its principal has employed or directed him to do and . . in the effort to accomplish it. When such conduct comes within the description that constitutes an actionable wrong, the corporation principal, . . . is liable not only for "the act itself, *but for the ways and means employed in the performance thereof.*" [*Lyon v. Carey, supra,* 174 U.S. App.D.C. at 426, 533 F.2d at 653, quoting *Munick v. City of Durham,* 181 N.C. 188, 193–94, 106 S.E. 665, 667–68 (1921) (emphasis added in *Lyon v. Carey*).]

The employer will not be held liable for those "willful acts, intended by the agent only to further his own interest, not done for the [employer] at all." *Nelson v. American-West African Line, Inc.,* 86 F.2d 730, 731 (2d Cir. 1936), *cert. denied,* 300 U.S. 665, 57 S.Ct. 509, 81 L.Ed. 873 (1937). When a servant's conduct is wholly unprovoked, highly unusual, and outrageous, these facts alone may be sufficient to indicate that the motive for an intentional tort was personal. W. Prosser, *supra* at 465. "The outrageous quality of an employe's [*sic*] act may well be persuasive in considering whether his motivation was purely personal." *Ochsrider v. Reading Co.,* 172 F.Supp. 830, 832 (E.D.Pa.1959), citing Restatement (First) of Agency § 235, Comment c (1933).

■ Whether an assault "which was the proximate cause of the injury was within the scope of the employment . . . as a general rule, has been held to be a question of fact for the jury to determine." *Great A&P Tea Co. v. Aveilhe, supra* at 164. *See M. J. Uline Co. v. Cashdan,* 84 U.S.App. D.C. 58, 59–60, 171 F.2d 132, 133–34 (1948).

5. In *Dilli v. Johnson,* 71 U.S.App.D.C. 139, 107 F.2d 669 (1939), the owner of a restaurant was held vicariously liable for an assault committed on a customer by the manager of the restaurant. The court found "that the servant, whose duty it was to serve [the restaurant's] patrons and to adjust any disputes or differences with the customer, was acting within the scope of his employment when he resented [a] complaint [by a customer] by violently attacking [the customer.]" *Id.* at 140, 107 F.2d at 670. The assault arose directly from the employer's instructions and responsibility given to the employee to settle all disputes.

In *Lyon v. Carey, supra,* a deliveryman was told to accept cash before delivery. When the customer's agent demanded inspection before payment, an argument erupted that led to a rape. The court found the store owner liable since the dispute was a direct outgrowth "of the very transaction which had brought [the deliveryman] to the premises, and . . . out of the employer's instructions . . . ." *Id.* at 174 U.S.App.D.C. 425, 533 F.2d at 652. The "linchpin of our [*Lyon*] decision was that the dispute was originally undertaken *on the employer's behalf.*" *International Distributing Corp. v. American District Telegraph Co., supra* 186 U.S.App.D.C. at 308, 569 F.2d at 139 (emphasis in original).

However, when all reasonable triers of fact must conclude that the servant's act was independent of the master's business and solely for the servant's personal benefit, then the issue becomes a question of law. *See Great A&P Tea Co. v. Aveilhe, supra* at 164–65.

The preliminary question for the trial court is "whether there is any [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Gunning v. Cooley,* 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930), quoting *Schuylkill & Dauphin Improvement & Railroad Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872) (emphasis in original). If such evidence exists, the trial court is obliged to give the case to the jury.

II

Since we must decide whether the appellant was entitled to a directed verdict or judgment notwithstanding the verdict, i. e., whether, on the evidence presented, the issue of scope of employment should have been resolved adverse to appellees as a matter of law, we view "the evidence and all inferences reasonably deductible therefrom in a light most favorable to [appellees]." *District of Columbia v. Jones,* D.C.App., 265 A.2d 594, 595 (1970), quoting *Vaughn v. Neal,* D.C.Mun.App., 60 A.2d 234, 235–36 (1948). We need not decide whether there was evidence from which the jury could reasonably conclude that Jones was in appellant's employment (in the sense of "on duty") at the time of the assault for we conclude, as a matter of law, that his conduct was in no sense, either wholly or partially in furtherance of appellant's business.

The violent and unprovoked nature of Jones' attack indeed suggests a personal as distinguished from business-related motive. Further, the altercation between the appellee Arthur Reddick and Jones was neither a direct outgrowth of the employee's instructions or job assignment, nor an integral part of the employer's business activity, interests or objectives. There is nothing in the business of running a railroad that makes it likely that an assault will occur between a railroad brakeman and a taxicab driver over the celerity with which the latter will provide a taxicab ride to the former.

In sum, we hold, as a matter of law, that the assault by Jones upon appellee was in no degree committed for appellant's benefit, to further its interest, or to serve its purposes. Neither was it "the more or less inevitable toll of a lawful enterprise," *United States v. Romitti, supra* at 666, quoting Harper and James, *supra* § 26.7 at 1376–77, nor the product of a job-related controversy, *Lyon v. Carey, supra,* 174 U.S.App.D.C. at 424, 533 F.2d at 655, but rather was "solely for the accomplishment of the independent malicious or mischievous purposes of the servant," *Great A&P Tea Co. v. Aveilhe, supra* at 165, quoting *Evers v. Krouse,* 70 N.J.L. 653, 58 A. 181 (1904), and thus was outside the scope of Jones' employment.[6]

*Reversed.*

---

6. In light of our holding on this issue, we need not reach the other issues raised by the parties to this appeal.