**HOWARD UNIVERSITY, Appellant, Cross-Appellee,**

v.

**Marie L. BEST, Appellee, Cross-Appellant.**

**Nos. 83–122, 83–147.**

District of Columbia Court of Appeals.

Argued June 20, 1984.

Decided Nov. 9, 1984.

Richard J. Hopkins, Washington, D.C., for appellant, cross-appellee.

John M. Clifford, Washington, D.C., for appellee, cross-appellant.

Before FERREN, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

The controversy in this case arises out of the employment contract of Dr. Marie Best, appellee-cross-appellant, with Howard Uni-

versity. The primary issues raised in this appeal concern Dr. Best's claims of breach of contract, sex discrimination, and intentional infliction of emotional distress. We affirm the trial court's finding that Dr. Best was entitled under the express terms of her contract to one year's notice of non-renewal, but hold the trial court erred in directing a verdict on the ground that she was also entitled to indefinite tenure by reason of an entitlement to reappointment because of late notice of non-renewal. We hold also that there is a cause of action for sex discrimination based on sexual harassment under the District of Columbia Code and that Dr. Best presented a prima facie case thereof and thereby also presented a prima facie case of intentional infliction of emotional distress; hence, the trial court erred in directing a verdict on these claims. Accordingly, we reverse and remand for a new trial.

## I.

Dr. Marie L. Best was a professor and chairperson of the Department of Pharmacy Practice at Howard University, appellant-cross-appellee, from July 1, 1976 to June 30, 1979. On December 14, 1978, she was notified that at the end of her three-year appointment, on June 30, 1979, she would not be recommended for reappointment. She filed suit on December 13, 1979, against the University and several named individuals (individually and in their official capacity), Dr. James Cheek, President of the University, Dr. Carleton Alexis, Vice President for Health Affairs at the University, and Dr. Wendell Hill, Jr., Dean of the College of Pharmacy and Pharmacal Services. She charged the various defendants with breach of contract, sex discrimination, defamation, and intentional infliction of physical and emotional distress, and sought to recover compensatory damages (including loss of future income), punitive damages, and to enjoin the defendants from failing to grant her indefinite tenure. At the close of her evidence, in a jury trial, the trial court directed a verdict against her on the claims of sex discrimination, intentional

infliction of emotional distress, and defamation (thus dismissing the case as to the individual defendants). At the close of all the evidence the trial court directed a verdict against Howard University for breach of contract, and submitted the issue of damages to the jury. The jury returned an award of $851,000 to Dr. Best; the trial court subsequently granted a new trial on the ground the damages were excessive. A new trial on damages, before a second judge and jury, resulted in a verdict for Dr. Best for $375,000.

Howard University appeals the directed verdict on the issue of its liability for breach of contract, and also asserts that the first trial court improperly instructed the jury on the measure of damages. Dr. Best appeals the first trial court's ruling that the damages awarded as a result of the first trial were excessive, and contends the award of a new trial on that issue was an abuse of discretion. Alternatively, if the trial court's grant of a new trial is affirmed, she contends the trial court erroneously directed a verdict against her on her claims of sex discrimination, intentional infliction of emotional distress, and defamation. After a brief discussion of the factual background of this case, we examine the parties' contentions.

Dr. Marie L. Best holds a bachelor of science degree, master of science degree, and Ph.D in Pharmacy and has spent much of her career since 1959 in teaching and administration. In 1975, while an assistant professor at the University of Wisconsin, she was offered a position at Howard University as a full professor and chairperson (chair) of the Department of Pharmaceutical and Health Administration (later the Department of Pharmacy Practice) by then Dean Robinson. Correspondence between Dean Robinson and Dr. Best indicated that the University wanted Dr. Best to begin in January 1976, but she was unable to leave her responsibilities in Wisconsin until April 30, 1976, and suggested she could serve either as a consultant or visiting professor and assume her full-time duties on July 1,

1976. Dean Robinson arranged for Dr. Best to serve as a part-time professor from April 1 to June 30, 1976; on July 1, 1976, she assumed full time duties as professor and Chair of the new Department of Pharmacy Practice (See Plaintiff's Exhibits 2, 6, 7 and 8, Appendix to Brief of Appellant Howard University).

In October 1976 Dean Robinson resigned. Dr. Best was appointed Acting Dean in November 1976 and served (and was considered for the position permanently) until September 1977 when Dr. Wendell Hill, Jr. was appointed Dean. Dr. Best continued to serve as professor and chair of her department. On December 14, 1978 she received notice from Dean Hill that upon the completion of her term on June 30, 1979, he did not intend to recommend renewal of her contract. During the next months she made a number of attempts to discover why the Dean did not intend to recommend renewal, and also sought the aid of Dr. Alexis. After her request for a hearing before the Grievance Committee was denied, she brought suit.

## II. *Breach of Contract*

Dr. Best's claims for breach of contract arise from her contention, on alternative theories, that she was a professor with indefinite tenure. She contends that she was entitled to indefinite tenure by virtue of provisions of the Howard University Faculty Handbook (Handbook) (see appendix to this opinion), which were part of her contract with the University, because she was not "without previous appointment at the University" when she was reappointed on July 1, 1976 to the rank of professor (Handbook Section III(C)(3)(c)). Alternatively, she contends her maximum probationary year was 1978–1979 and she was therefore entitled under Handbook provisions to be notified by June 30, 1978 if the University chose to terminate her services, and in the absence of timely notice, she was entitled to reappointment, which at her rank assured indefinite tenure. (Handbook Sections III(C)(2) and (C)(3)(c)). The University contends that, as an accommodation

to Dr. Best, her initial appointment on April 1, 1976, as a visiting professor was a special appointment, which is not a tenure track appointment within the meaning of a "previous appointment" that would result in her indefinite tenure on July 1, 1976. (Handbook Section I(B)(1)(d)). The University also contends that Dr. Best did not receive late notice of non-renewal, but that even if she did, such late notice does not result in an award of indefinite tenure. (Handbook Sections III(A)(1) & (2) and V(B)(1)(c) & (B)(4)).

The trial court granted a directed verdict against the University on the breach of contract claim at the close of all the evidence. It dismissed Dr. Best's first theory of indefinite tenure by virtue of reappointment without prejudice to her right to reassert it in the future and found that there were thus no factual issues in dispute, the only issue being the interpretation of the employment policies of the Faculty Handbook which, according to the testimony, was a part of Dr. Best's employment contract, along with her employment papers. The trial court ruled that it was clear under the applicable provision of the Handbook that Dr. Best was entitled to receive one year's notice of non-renewal, that late notice of non-renewal resulted in re-appointment, and that re-appointment, according to other provisions of the Handbook, gave Dr. Best indefinite tenure.

A directed verdict is appropriate only when the evidence is so clear that reasonable men could reach but one conclusion. *Papanicolas v. Group Hospitalization, Inc.*, 434 A.2d 403, 404 (D.C.1981). This court has held that if a contract is ambiguous, and the evidence supports more than one reasonable interpretation, the interpretation is a question of fact for the jury. *1901 Wyoming Avenue Cooperative Ass'n v. Lee*, 345 A.2d 456, 461 n. 8 (D.C.1975) (citing *Rich v. Sills*, 130 A.2d 920, 922 (D.C.1957)); 4 WILLISTON ON CONTRACTS § 616 at 660–62 (3d ed. 1961). *See also* 3 CORBIN ON CONTRACTS § 554, pp. 222–27 (1960 ed.). But if the meaning of a

contract is so clear that reasonable men could reach but one conclusion or no extrinsic evidence is necessary to determine the contract's meaning, then contract interpretation is a matter for the court. *Id.; Giles v. Howard University,* 428 F.Supp. 603, 605 (D.D.C.1977).[1]

■■■■ This court adheres to the "objective law" of contracts, whereby the

> written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake.

*Minmar Builders, Inc. v. Beltway Excavators, Inc.,* 246 A.2d 784, 786 (D.C.1968) (quoting *Slice v. Carozza Properties,* 215 Md. 357, 368, 137 A.2d 687, 693 (1958)). However, even when a contract is integrated, "where there is some lack of clarity in the terms of the contract, other testimony regarding the intent of the parties and the meaning of the terms in the context may be required, and will properly be admitted in order to reach an objective interpretation." *Id.*[2] In so doing, however,

> The presumption is that the reasonable person knows all the circumstances before and contemporaneous with the making of the integration. The reasonable person is also bound by all usages—habitual and customary practices—which either party knows or has reason to know. The standard is applied to the

circumstances surrounding the transaction and to the course of conduct of the parties under the contract, both of which are properly considered when ambiguous terms are present.

*1901 Wyoming Avenue Cooperative Ass'n v. Lee, supra,* 345 A.2d at 461–62 (footnotes omitted).

■■■■ The parties disagree about whether Dr. Best's contract with the University was integrated. However, in construing contracts of employment in a university setting, we follow the instruction that such employment contracts "comprehend as essential parts of themselves the hiring policies and practices of the University as embodied in its employment regulations and customs." *Greene v. Howard University,* 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969).

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.

*Id.* As noted by this court, in the absence of an express term to the contrary, the usual practices surrounding a contractual relationship can become the contractual obligation. *Bason v. American University,* 414 A.2d 522, 525 (D.C.1980); *Pride v. Howard University,* 384 A.2d 31, 35 (D.C. 1978). Thus, if we find that the meaning

---

**1.** The standard of review is thus not limited to a "clearly erroneous" standard unless extrinsic evidence was utilized. *Washington Metropolitan Area Transit Auth. v. Mergentime Corp.,* 200 U.S.App.D.C. 95, 97, 626 F.2d 959, 961 (1980).

**2.** The first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant. *Intercounty Construction Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982). This means

> First, there is the presumption that the reasonable person knows all the circumstances surrounding the making of the contract. Secondly, the reasonable person is bound by all

usages which either party knows or has reason to know. Thirdly, the reasonable person standard is applied both to the circumstances surrounding the contract and the course of conduct of the parties under the contract. *1901 Wyoming Avenue Cooperative Assn. v. Lee, supra* at 461–62. Finally, the court should look to the intent of the parties entering into the agreement. *District of Columbia Department of Housing and Community Development v. Pitts,* [370 A.2d 1377], 1380 [D.C. 1977]. See also RESTATEMENT (SECOND) OF CONTRACTS § 230 (1932); 4 WILLISTON ON CONTRACTS § 600 et seq. (3d ed. 1961).
> *Id.*

of the disputed language in a contract is open to several reasonable interpretations in view of a usage or custom, the issue of whether a party knew or had reason to know of a usage would present a question of fact for the jury. *1901 Wyoming Avenue Cooperative Ass'n v. Lee, supra,* 345 A.2d at 461–62 & n. 11.

We first examine the trial court's ruling that Dr. Best was entitled to tenure by virtue of receiving late notice of non-renewal.

## A.

■ The trial court ruled that Section III(C)(2) of the Handbook, requiring one year's notice of non-renewal of an appointment, applied to Dr. Best. Specifically, the trial court held that Dr. Best was covered by Section III(C) because she was a regular, full-time faculty member in her final probationary year, and was entitled to tenure under Section III(C)(3)(c) due to the University's failure to provide her with timely notice. Accordingly, we must first determine whether Dr. Best's contract provided that she was entitled to receive one year's notice of non-renewal; if so, then we must determine whether that late notice resulted in her automatic re-appointment with automatic tenure.

The evidence amply supports the trial court's conclusion that Dr. Best was a regular full-time faculty member from July 1, 1976 to June 30, 1979, who, at the time she received notice of non-renewal, in December 1978, was in her final probationary year as a professor with a three-year appointment at Howard and no prior appointment at the University. *See* Handbook Section I. Dean Hill testified that Dr. Best was a full-time regular faculty member who would have received tenure had she been reappointed in July 1979. William Harris, an assistant professor of pharmacy,

Captain Bosdekian, former assistant dean to Dean Robinson, and Ralph Arline, a former instructor of Pharmacy Practice, all testified that Dr. Best was a full professor as of July 1, 1976.[3]

The University asserts, however, that the one-year notice provision of Section III(C)(2) did not apply to Dr. Best because, by custom and practice, it only applies to persons who must serve a probationary appointment of seven years or more. Dr. Best, having had prior experience at another university, could not be required to serve a seven-year probationary term; under Section III(C)(3)(c) of the Handbook she would serve three years and, if reappointed, would receive tenure. The University argues that since the Handbook is subject to more than one reasonable interpretation the issue of what period of notice it was required to give Dr. Best should have been allowed to go to the jury. From our review of Dr. Best's contract we think the language is unambiguous under standard principles of contract construction and that extrinsic evidence regarding custom and practice is unnecessary.

It is clear from the Handbook that the one-year notice provision of Section III(C)(2) is "subject to the provisions below" and the provisions below the one-year notice provision include Section III(C)(3)(c) on professors who have previously served at other institutions. The University asserts, however, that Dr. Best was entitled to only six month's notice of non-renewal under Section V(B)(1)(c). This provision, however, which is applicable to all regular probationary faculty members regardless of rank, cannot reasonably be applied to professors in their final probationary year, as was Dr. Best, unless one ignores the more specific one-year notice provision which clearly applies to faculty in their

3. Dr. Alexis testified that Dr. Best was probationary during her three-year term, and that her first, part-time employment was "special" rather than "regular." He did not state, however, that her three-year appointment was not "regular," and a reading of Section III(C)(3)(c) which pro-

vides that Associate Professors and Professors shall be appointed for three years, does not render this testimony that Dr. Best was probationary inconsistent with the evidence that she was a "regular" professor.

final probationary year. Thus, the more specific contract term qualifies the general such that both may be given effect. *1901 Wyoming Avenue Cooperative Ass'n v. Lee, supra.*[4] Additionally, Section V(B) makes no reference to notification of receipt of indefinite tenure, as does Section III(C)(2); yet it is without dispute that Dr. Best would have achieved tenure had she been reappointed. It is Section III(C)(2) which provides for notice of either termination or, alternatively, indefinite tenure, and provides that such alternative notice "shall" be given one year before the final probationary year. That it is undisputed Dr. Best was entitled to tenure if reappointed, is further support for the trial court's application of the one year notice provision to Dr. Best, rather than the six month provision contended for by the University. Thus, construing the Handbook as the trial court did, and as Dr. Best urges us to do, gives all notice provisions effect: all regular full-time faculty in their final year of probation are entitled to one year's notice of non-renewal or indefinite tenure under Sections III(C)(2) and (C)(3)(c), and faculty members on term appointments who have not reached their final probationary year are only entitled to notice in accordance with Section V(B).[5] We hold that the trial court correctly ruled that Dr. Best was entitled to one year's notice of non-renewal of her reappointment and that Howard University breached its contract with her when it failed to give her such notice.

■ The University also asserts that late notice of non-renewal did not, as a matter of law, result in indefinite tenure for Dr. Best, and the trial court erred in ruling to the contrary. The trial court ruled that the University had the option of giving either one year's notice of non-renewal or of reappointing Dr. Best, that its failure timely to notify her of non-renewal resulted in her reappointment, and under the Handbook, her reappointment brought tenure according to Section III(C)(3)(c). The University does not contest that if Dr. Best were reappointed she would receive indefinite tenure.

It has been previously held in this jurisdiction that a faculty member who is not informed of non-renewal of his appointment in accord with the time limits set out in his Faculty Handbook has a legitimate expectancy of re-employment arising from the University's custom and practice. *Greene v. Howard University, supra,* 134 U.S.App.D.C. at 87, 412 F.2d at 1134. Other jurisdictions have similarly construed notice provisions for termination and non-renewal. *Pima College v. Sinclair,* 17 Ariz. App. 213, 215, 496 P.2d 639, 641 (1972) (failure to give college teacher proper notice of contract termination caused his contract to be automatically renewed under explicit Handbook provision that teacher may assume invitation to continue teaching); *Thomas v. Ward,* 529 F.2d 916 (4th Cir.1975) (handbook which provided that probationary status lasted three years, and that after 1967–68 school year teachers were employed on continuing contract with dismissal only for incompetence or disreputable conduct, created a legitimate expectancy of employment and a teacher with five years experience was no longer probationary). At least one court has granted tenure as a result of late notice, where a state statute was construed as intending to

4. Further, the University's own witnesses contradicted each other as to Dr. Best's status as a probationary employee and the effect it would have on notice. Dean Hill testified that (C)(2) (one-year notice) did not apply to Dr. Best because it only applied to probationary appointments, not the associate and full professors listed in (C)(3)(c) of the same section. Dr. Alexis testified that Dr. Best *was* probationary, but was only entitled to the six month notice under Section V(B)(1)(c).

5. This construction is also in accordance with the norms of academia, as cited in *Greene v. Howard Univ., supra,* 134 U.S.App.D.C. at 86 n. 7, 412 F.2d at 1133 n. 7 (one year's notice preferred so that faculty member has sufficient time to seek other employment), wherein the University purported to accept as guideline principles the policy of the American Association of University Professors in matters of academic tenure.

provide special protection for teachers. *Davis v. Board of Education of the Harrison Community Schools*, 126 Mich.App. 89, 97, 342 N.W.2d 528, 532 (1983) (failure to give termination notice 60 days prior to end of probationary period, as required by statute, results in achievement of tenure). On the other hand, it has also been held that where there is a three year probationary term it ends automatically and there is no reasonable expectancy of further tenure. *Smith v. Green*, 86 Wash.2d 363, 367–68, 545 P.2d 550, 553–54 (1976) (probationary faculty appointment was designed to avoid de facto tenure);[6] *Abramson v. Board of Regents*, 56 Hawaii 680, 548 P.2d 253 (1976) (under express language of contract teacher's employment after her maximum probationary year did not result in tenure). Each of these cases, however, construed specific contract or statutory provisions and did not grant or withhold tenure solely on the basis of late notice of non-renewal. Thus, they are not persuasive regarding Dr. Best's expectancy of re-appointment unless the provisions of Dr. Best's contract are similar.

Dr. Best argues that she was entitled to reappointment because of a reasonable expectation inferred from the requirement in Section V(B)(3) of the Handbook that a faculty member must notify the dean if he wishes to decline a renewal in the absence of notice of non-renewal. She also relied on the inference that regular professors have greater rights than specially appointed faculty and that Section III(B) of the Handbook limits its disclaimer of a presumption of renewal to special appointments. The University argues that the purpose of the notice provision is not to grant tenure and in the absence of an express contract provision providing for renewal of a contract for a like term in the event of untimely notice, Dr. Best cannot claim de facto tenure or recover damages for her dismissal in the absence of injurious reliance on University assurances of tenure, as there were in *Soni v. Board of Trustees of University of Tennessee*, 513 F.2d 347 (6th Cir.1975) and *Bruno v. Detroit Institute of Technology*, 51 Mich. App. 593, 215 N.W.2d 745 (1974).

We have carefully reviewed Dr. Best's contract, which includes letters of offer and acceptance, employment papers prepared by the University, and the Handbook's statement of employment policies. Of significance in our analysis of her claim of a reasonable expectancy of reappointment is the recognition that the trial court was of the view that the University's obligation to Dr. Best could be derived solely from the contract documents, and that Dr. Best's claim to an expectancy is not based on any express provision in her contract, as was her claim to entitlement to receive one year's notice, but on inferences from language referring to faculty members who are not of her same status. Accordingly, we examine the basis on which it can properly be determined whether a person in Dr. Best's position would have a reasonable expectancy of reappointment.

In *Greene v. Howard University, supra*, 134 U.S.App.D.C. at 86, 412 F.2d at 1133, the D.C. Circuit relied on the language of the faculty member's contract "buttressed by affidavits and depositions" that "the usual practice of the University was to inform non-tenured faculty members by January or April depending on the length of their appointments, whether they would be reappointed for the next school year." The accompanying footnote commented that "this usual practice, of course, can be raised to the level of a contractual obligation." The court further noted that the contract language of the Handbook made it clear that a faculty member, if untimely notified of non-renewal, "had a legitimate reason to believe he could rely on returning to Howard the following semester." *Id.*

---

**6.** *Cusumano v. Ratchford*, 507 F.2d 980 (8th Cir.1974), relied upon by the University because it rejected the concept of de facto tenure, is not relevant to Dr. Best's claim to tenure because in *Cusumano*, the plaintiffs-teachers were given timely notice of non-renewal of their appointments. *Id.* at 984.

134 U.S.App.D.C. at 87, 412 F.2d at 1134. In reaching this conclusion the court noted that by reading the Handbook as a whole, such a faculty member was entitled to a hearing before being separated from the academic community for alleged misconduct since he had acquired "a different dimension of relationship because of expectations inherent in the University's failure to give notice as contemplated by its own regulations." *Id.*, 134 U.S.App.D.C. at 88, 412 F.2d at 1135. The court further commented, however, that "[t]hat new relationship does not at all mean that the University must invariably reappoint whenever it fails to give notice at the specified time." *Id.*

Following a similar analysis in this case, we find that the only language in Dr. Best's contract which refers explicitly to the effect of late notice is Section V(B)(4) of the Handbook which provides that late notice of non-renewal entitles a faculty member to a statement of the reasons for non-renewal. Other than this provision, the Handbook states that there is no presumption of renewal for special appointments (Section III(B)(2)), and that for regular classes of academic positions a professor without previous appointment who is appointed for a period of three years, shall "if reappointed" be given indefinite tenure.

(Section III(C)(3)(c)). The parts of the Handbook in the record before us do not describe the procedures for reappointment or indefinite tenure.[7]

Dr. Best presented evidence regarding her own expectations of permanency in coming to Howard University from the University of Wisconsin, but did not offer evidence that in other similar cases late notice had resulted in indefinite tenure through reappointment. She testified that it was her understanding that full time professors are tenured. While she was aware she had only a three year contract she viewed it as relating to her appointment as chair. (See Administrative Policies Relating to Selection of Deans and Department Chairman, Section F, Handbook at 44). She admitted she had not received any document from the University indicating she had indefinite tenure, but contended that her expectancy was reasonable since she had continued to serve during her final probationary year as full professor and chair.[8] She also testified that her colleagues never disputed her claim she was tenured and that the President of the University had expressed his hope she would have a long tenure with the University when he introduced her in a written statement upon her appointment as Acting Dean. Later when Dean Hill became Dean

7. Neither Dr. Best nor the University suggests Section IV of the Handbook is applicable. We agree. By its terms, Section IV refers to promotions in rank and while it is reasonable to view the award of tenure as a promotion, Dr. Best's contract defines rank in a manner in which it is clear that Dr. Best had already achieved the highest rank possible without tenure under that procedure. Dr. Alexis testified in his deposition that the tenure criteria were generally similar to those for promotion, but it was unclear whether the process and criteria for tenure were set forth in writing at the time in question here. *See* Deposition of Dr. Cheek, President of Howard University, of August 7, 1981 at 289.

8. The evidence before the trial court is distinguishable from cases in which the faculty member was found to have relied to his detriment on University actions or assurances. For example, in *Greene v. Howard University, supra,* the undisputed facts were that the faculty member had

been recommended to the Dean to be continued as an Assistant Professor for two more years beginning July 1, 1967, and that when the faculty member had requested a leave of absence to take a teaching position for the first academic year, the University said his services were needed and the faculty member therefore rejected the teaching position elsewhere. Shortly thereafter he received a "good" rating from his departmental chairman and was assigned a course and requested to produce a reading list for the fall semester. He was also recommended by the chairman for a staff position at the University during the summer. A month later he received a letter, not unlike the one Dr. Best received from Dean Hill, that after the automatic termination of his contract on June 30, 1967, he would not be reappointed. The court held it was clear the faculty member had been rehired for two years when the University abruptly changed its mind as a result of its investigation of campus disturbances.

he had offered her the position of Assistant Dean, but she had turned it down because she preferred to remain Chair of the department. She also admitted she was familiar with the University's policies governing reappointment and tenure as well as the procedures for dismissal; following receipt of her letter from Dean Hill, she had requested a grievance hearing and a statement of reasons for the non-renewal of her appointment.

The University presented evidence, through the testimony of Dr. Alexis, and buttressed by the deposition of the President of the University, that the general custom and practice under Section III(C)(3)(c) called for the appropriate dean to make a recommendation for reappointment to the President of the University who would decide whether or not to submit the recommendation to the Board of Trustees which had to make the final decision on all reappointments and grants of indefinite tenure; the process was not followed in Dr. Best's case because the dean did not recommend her reappointment. Dr. Alexis further testified it was the custom and practice of the University to appoint professors with experience elsewhere to an initial three-year term so that the University could use that period for observation in order to determine, prior to making a decision on a reappointment and thereby indefinite tenure, whether a faculty member lived up to his reputation and how he fit into the University. The decision whether to reappoint a person with tenure is, he testified, "the single most critical decision [of] the board [of trustees]." Dr. Heman-Ackah testified that he worked closely with Dean Robinson and that Dr. Best was appointed in accordance with the regular practice of the University in hiring outside professors, noting that he had initially received a three-year appointment, and became tenured when he was reappointed after a favorable recommendation by the dean.

Reading Dr. Best's contract as a whole, we conclude it is ambiguous on its face with respect to the effect of late notice of a reappointment resulting in indefinite tenure. The meaning of the phrase "if reappointed" in Section III(C)(3)(c) of the Handbook was open to several reasonable interpretations. A genuine issue of material fact was thus presented and should have been allowed to go to the jury. *1901 Wyoming Avenue Cooperative Ass'n v. Lee*, *supra*, 345 A.2d at 461.

In Dr. Best's view, any ambiguity about the meaning of the phrase "if reappointed" in Section III(C)(3)(c) is resolved by the inferences drawn from Section V(B)(3), which she contends indicate that continuous service is tantamount to reappointment in the absence of timely notice of non-renewal, and in Section III(B) which expressly disclaims automatic renewals for special appointments. However, to the extent she relies on Section V, Termination of Service, to obtain rights under Section II, Types of Appointments, she faces a problem in the absence of proof of such a custom and practice. Viewing her contentions in light of the language in Section III(A)(1), that the terms and conditions of appointment must be in writing, her three-year appointment would expire automatically on June 30, 1979, pursuant to Section V(A), in the absence of some other action by the University. Moreover, insofar as Section V(B)(3) can provide a basis for Dr. Best's claim of a reasonable expectation of reappointment, it applies, for reasons noted in our discussion of her entitlement to one year's notice, only to probationary appointments not in their final probationary year; Dr. Best's status "if reappointed" would no longer be that of a probationary appointment. But even accepting her contention that she is entitled to rely on the inference from Section V(B)(3), her contract would only entitle her upon late notice of non-renewal to a statement of reasons for non-renewal (Section V(B)(4)), not to reappointment much less indefinite tenure. Further, by giving her six months notice under Section V(B)(1)(c), the University had, arguably, effectively rebutted the reasonable-

ness of her expectation under Section V(B)(3).

Section III offers little explicit support for Dr. Best's position. In addition to requiring that the terms and conditions of appointment be in writing, the language of Section III(C)(3)(c) makes reappointment conditional. As regards notice, Section III(A)(1)(2) provides only that the University must give notice of promotions or other changes in terms and conditions of service "as promptly as possible" (Section III(A)(1)(2)). Nor is the language of Section III(B) for special classes of academic appointments any more explicit in resolving the meaning of the phrase "if reappointed" for regular classes of academic positions when notice of non-renewal is untimely; at most Section III(B) rebuts any inference under Section V(B)(3) for special appointments. On the other hand, the University argues that purpose of the notice requirement is to give a faculty member sufficient time to find employment and is independent of the award of tenure. It would resolve any ambiguity in the phrase "if reappointed" by reference to the evidence it presented on the custom and practice for reappointments and granting tenure as defeating an expectancy of indefinite tenure based solely on service following late notice of non-renewal.

While we do not question the University's assertions about the significance of granting indefinite tenure, the University no less than Dr. Best is bound by the contracts it makes. It is clear, however, that the disputed issue between them cannot be resolved without reference to the University's custom and practice for making reappointments and granting indefinite tenure generally as well as its custom and practice specifically, if any, when a faculty member whose reappointment would result in indefinite tenure receives late notice of non-renewal. Contrary to Dr. Best's contentions, her contract documents do not elevate timely notice to a contractual right whereby late notice results in automatic reappointment; the express terms of her contract required her to receive a reappointment in order to gain indefinite tenure and limited her rights upon late notice to a statement of reasons for non-renewal. Unlike the contracts, statutes or university regulations present in the cases on which Dr. Best relies to support her claim of reasonable expectation of reappointment, her contract does not expressly state that tenure is automatic upon successful completion of a three-year term[9] or that a faculty member should consider herself tenured so long as her work was satisfactory and she displayed a cooperative attitude,[10] or that a faculty member was employed "on a continuing contract basis."[11] Nor did the University's tenure policy suggest that based on Dr. Best's performance she was to be "considered tenured."[12] Nor does the evidence in Dr. Best's case demonstrate facts similar to those in which de facto tenure has been awarded on a

**9.** In *Pima College v. Sinclair, supra,* 17 Ariz.App. at 214–15, 496 P.2d at 640–41, a statute provided for automatic renewal of a teacher's contract in the absence of timely notice. *Davis v. Board of Education of Harrison Com. Sch., supra,* 126 Mich.App. at 94, 342 N.W.2d at 531, also turned on statutory construction of a statute intended to protect teachers. *Cf. Smith v. Green, supra,* 86 Wash.2d at 367–68, 545 P.2d at 553–54 (where statute provided probationary appointment did not continue beyond three years, at which time trustees make final decision on tenure, held that any expectancy of tenure was unreasonable).

**10.** *Perry v. Sindermann,* 408 U.S. 593, 600, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

**11.** In *Thomas v. Ward, supra,* 529 F.2d at 918, the faculty handbook stated teachers "are employed on a continuing contract basis." A similar provision was in the manual in *LaTemple v. Wamsley,* 549 F.2d 185, 186 (10th Cir.1977).

**12.** In *Bruno v. Detroit Inst. of Technology, supra,* 51 Mich.App. at 595, 215 N.W.2d at 747, the court construed a written tenure policy against the University in finding appellant had "acceptably performed" and was therefore "considered tenured" (quotes from tenure policy).

theory of detrimental reliance on university assurances.[13]

■ Therefore, in the absence of explicit language on the effect of late notice where a reappointment would result in indefinite tenure, and in the absence of specific assurances to that effect by the University, the University's custom and practice become a part of Dr. Best's contract. *Bason v. American University, supra,* 414 A.2d at 525; *Pride v. Howard University, supra,* 384 A.2d at 35. A factual determination of that custom and practice is required to resolve whether Dr. Best had a reasonable expectancy of reappointment if she received late notice and if so, then whether it was the custom and practice of the University to view service as resulting in an automatic reappointment with indefinite tenure. *1901 Wyoming Avenue Cooperative Ass'n v. Lee, supra,* 345 A.2d at 461–62 & n. 11. Following the analysis in *Greene v. Howard University, supra,* we agree with the trial court that because Dr. Best was entitled to receive timely notice, the University's failure to do so put a "different dimension" on their relationship. But we disagree with the trial court's conclusion that under her contract, without reference to custom and practice, the language was only susceptible to the interpretation that the University had two options available to it: timely notice or automatic reappointment with indefinite tenure. Under *Greene v. Howard University,* 134 U.S.App.D.C. at 88, 412 F.2d at 1135, custom and practice are relevant in the absence of an explicit provision that reappointment resulting in indefinite tenure is automatic upon late notice of non-renewal.

Not only did her contract contain an explicit provision limiting her rights under Section V as a result of late notice, but a determination of whether her expectancy of reappointment under Section III was nevertheless reasonable depended on the University's custom and practice for making reappointments resulting in indefinite tenure. The trial court properly admitted extrinsic evidence on the University's custom and practice,[14] but erred in failing to give it any weight. In any event, the determination of the custom and practice and reasonableness of her expectation were questions of fact for the jury. *Bason v. American University, supra,* 414 A.2d at 525.

Accordingly, we hold it was error for the trial court to direct a verdict against the University on the grounds that late notice entitled Dr. Best to reappointment, and thence indefinite tenure. Dr. Best's expectancy may have been real, but we hold that it was only a hypothetical expectancy at the time the trial court directed a verdict, and not an entitlement because of the absence of key findings of fact. A jury might find that the University's custom and practice entitled Dr. Best to such an expectancy, but it is not clear from her contract documents alone.

## B.

■ Dr. Best's alternate theory of her entitlement to indefinite tenure was based on the Handbook provision which provided that she would have indefinite tenure if she was not without previous appointment

---

**13.** For example, in *Soni v. Board of Trustees, supra,* 513 F.2d 347, Dr. Soni had been recommended for tenure by the Dean and was told by the University department head that the University wanted him to be tenured but under state laws he first had to become a citizen. Dr. Best did not receive such assurances of tenure from Dean Hill or Dr. Alexis when she inquired of her status following receipt of Dean Hill's letter.

**14.** CORBIN, *supra,* § 539, at 83, citing *Atlantic Northern Airlines v. Schwinner,* 12 N.J. 293, 96 A.2d 652 (1953) (evidence of circumstances always admissible in interpretation of integrated contract, even where contract free on its face from ambiguity). *See* CORBIN, *supra,* § 556 at 243 n. 85 (proof of usage and custom to add provisions to a contract) (quoting RESTATEMENT, CONTRACTS § 246(b) comment c: "The principle on which the evidence is admissible is that the parties have not set down on paper the whole of their contract in all of its terms, but only those which were necessary to be determined in the particular case by specific words, leaving to implication and tacit understanding all those general and unvarying incidents which a uniform usage annexes").

when she was reappointed on July 1, 1976. She also relies on her employment papers which refer specifically to her "appointment" on July 1, 1976, and on her negotiations with Dean Robinson that she would thereby receive indefinite tenure at the University. We hold that the trial court was correct in ruling that there was a disputed issue of fact regarding whether Dr. Best had received one or two appointments for purposes of gaining indefinite tenure.

The Handbook, Section III(C)3(c), states Associate Professors and Professors shall be appointed with indefinite tenure, except that such persons "without previous appointment at the University shall be appointed for a period of three years ...." The disputed issue is the meaning of the words "previous appointment." The employment papers for Dr. Best's July 1, 1976 appointment refer to a "reappointment," and another way to frame the issue is, what was the nature of her first (April 1 to June 30, 1976) appointment? Her employment papers reflect that she received a part-time, three month appointment in April 1976 and a full-time, three year appointment in July 1976. On its face, the July 1, 1976 appointment does not repeat the previous appointment; nor do her employment papers specifically indicate the reappointment is with indefinite tenure.[15] Dr. Best testified that her duties were substantially different prior to July 1, 1976. Section II of the Handbook makes clear that her status as the holder of a non-academic position (her appointment as a department chair on July 1, 1976) is not determinative of the nature of her academic appointment to the faculty. *See Howard*

*University v. Durham*, 408 A.2d 1216 (D.C.1980) (divisibility of contract where person has academic and non-academic appointments).

Dr. Best testified that the procedure of two appointments was intended by Dean Robinson and herself to give her tenure.[16] She had been told the Faculty Committee had ratified the two appointments, and in regard to her July 1, 1976 appointment as chair she noted that the Handbook provided a chair "shall be a member of the department with tenure." (See Administrative Policies Relating to the Selection of Deans and Department Chairmen" Section E, Handbook at 43). In support of Dr. Best's contention, Captain Bosdekian, then Assistant Professor and Assistant to Dean Robinson, testified that it was his understanding from conversations with Dean Robinson that Dr. Best was to be a full-time tenured professor as of July 1, 1976. Mr. Arline, an instructor of Pharmacy Practice at the University from 1976 to June 1978 and a member of the appointment committee when Dr. Best's appointment to the faculty was discussed in March 1976, also testified it was his understanding that the two appointments would automatically give her tenure; the Committee, however, did not vote on whether she should be considered for an appointment with indefinite tenure. The University offered the testimony of Dr. Alexis that there was never any intent or recommendation by Dean Robinson that Dr. Best receive tenure as a result of her two appointments.[17] He described her first appointment as a non-tenure track special appointment under Section I(B) of the Handbook, and labeled the two appointments "concur-

---

**15.** The employment papers for Dr. Best's appointment beginning July 1, 1976 state a termination date of June 30, 1979. This appears in a box on the employment form stating "Dates must be entered if not 'CA' or 'I'," a reference to an earlier box, which is blank on Dr. Best's form, referring to CA (continuing appointment (staff)) and I (indefinite). Also blank are the description of the appointment and the designation of the position change. In those places in the form where tenured status is to be indicated,

no such indication appears; nor is tenure mentioned in the justification statement on the form.

**16.** Dean Robinson did not testify; nor was any documentary evidence introduced to reflect his views.

**17.** Dr. Alexis admitted that he did not communicate this intent to Dr. Best.

rent appointments with different starting dates, as an accommodation to Dr. Best in view of her prior commitments." To interpret "reappointment" as Dr. Best urges, would, Dr. Alexis testified, be contrary to the purpose of the three year term appointment to allow the University to observe a person before making a decision whether or not to award tenure. Further, Dr. Alexis testified the Handbook's administrative policies on selection of chairs and deans was not part of Dr. Best's contract. We do not, in reviewing a motion for directed verdict, consider the weight or credibility of the witnesses. *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979). But since there are two reasonable interpretations of the phrase "previous appointment" and resort must be made to extrinsic evidence, the issue should have been presented to the jury. *Howard University v. Durham, supra,* 408 A.2d at 1219.

 To summarize: we affirm the trial court's directed verdict holding that the University breached the contract by giving Dr. Best late notice of non-renewal, and also its ruling there was a disputed issue of fact as to the meaning of the two appointments. We reverse the trial court's ruling that Dr. Best had indefinite tenure

as a result of late notice and remand the case for a new trial on the issue of her status as a tenured or non-tenured faculty member, and any damages to which she may be entitled.[18]

## IV.

We now address Dr. Best's assignments of error by the first trial court in directing verdicts against her claims of sex discrimination, intentional infliction of emotional distress, and defamation.

### A. *Sex Discrimination*

Dr. Best contends that the evidence which she presented in the trial court stated a cause of action for sex discrimination under the D.C. Human Rights Act.[19] Her evidence related to claims of sexual harassment and equal pay. As to the first, the trial court held that the District of Columbia Code does not provide a cause of action "purely and simply on sexual harassment." With respect to equal pay, the trial court ruled, at the close of Dr. Best's evidence, that she had failed to demonstrate that the pay differential was the result of sexual bias. We first address Dr. Best's contentions regarding sexual harassment.

**18.** The parties raise several issues as to various rulings made by the trial court on damages. Because we reverse the verdict for Dr. Best on indefinite tenure, we need not discuss these issues in detail; we do, however, wish to answer the parties' claims in light of the need to retry the case. First, Dr. Best asserts the first trial court abused its discretion when it granted the University's request for a new trial on the ground of excessive damages. We need not decide this issue since we hold the trial court erroneously directed a verdict for Dr. Best on tenure.

Second, the University contends the first trial court erred in refusing to instruct the jury that Dr. Best's damages for loss of future income had to be reduced to present value. The University did not raise the issue until the discussion on instructions at the end of trial, and did not submit a written request or any proposed instruction, Super.Ct.Civ.R. 51; thus neither side had presented any evidence on the issue. At the second trial, evidence of present value was produced by both parties and the trial court so

instructed the jury. While we need not decide whether the first trial court erred in ruling that the University had failed to comply with Super. Ct.Civ.R. 51, *Ceco Corp. v. Coleman,* 441 A.2d 940, 945 (D.C.1982), we hold, for purposes of retrial, that evidence of present value of any future damages to which Dr. Best may be entitled is required. *District of Columbia v. Jones,* 442 A.2d 512, 524 (D.C.1982).

Finally, the University claims the second trial court erred when, in its instruction to the jury on Dr. Best's duty to mitigate her damages, it refused to instruct that she had a duty to accept lesser employment after an extended period of unemployment. We find no error in the instruction given by the trial court. *District of Columbia v. Jones, supra,* 442 A.2d at 524; *Sade v. Staley,* 212 F.Supp. 631, 632 (D.D.C.1963).

**19.** D.C.Law 2–38, (effective December 13, 1977) 24 D.C.R. 6038, D.C.Code §§ 6–2201 et seq. (1978 Supp.), now codified at D.C.Code §§ 1–2501 et seq. (1981). All references to the Human Rights Act are to the 1981 edition of the Code.

■ *Sexual Harassment.* Section 211(a)(1) of the District of Columbia Human Rights Act, codified as D.C.Code § 1–2512(a)(1), states that it is an unlawful discriminatory employment practice:

(1) To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion

on the basis of, *inter alia,* sex. It is substantially similar to Title VII, 42 U.S.C. § 2000e–2(a)(1) (1966) which also makes it an unlawful employment practice:

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

In *Bundy v. Jackson,* 205 U.S.App.D.C. 444, 452, 641 F.2d 934, 942 (1981) the United States Court of Appeals for the District of Columbia held that Title VII

is not limited to disparate treatment founded solely or categorically on gender. Rather, discrimination is *sex* discrimination whenever sex is for no legitimate reason a substantial factor in the discrimination....

The D.C. Circuit found this conclusion followed "ineluctably from numerous cases finding Title VII violations where an employer created or condoned a substantially discriminatory work *environment,* regardless of whether the complaining employees lost any tangible job benefits as a result of the discrimination." *Id.* 205 U.S.App.D.C. at 453–54, 641 F.2d at 943–44. Following the view that "conditions of employment" include the psychological and emotional work environment, the court quoted with approval from the opinion of the Fifth Circuit Court of Appeals in *Rogers v. EEOC,* 454 F.2d 234, 235, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) noting that while the express language of Title VII did not mention the situation, Congress had chosen "the path of wisdom by being unconstrictive, knowing that constant change is the order of the day and that the seemingly reasonable practice of the present can easily become the injustice of the morrow." The "terms, conditions, or privileges of employment"

is an expansive concept which sweeps within its protective ambit the practice of creating a work environment heavily charged with ethnic or racial discrimination. * * * One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers * *.

*Bundy v. Jackson, supra,* 205 U.S.App. D.C. at 454, 641 F.2d at 944. The D.C. Circuit proceeded to ask rhetorically "how then can sexual harassment, which injects the most demeaning sexual stereotypes into the general work environment and which always represents an intentional assault on an individual's innermost privacy, not be illegal?" *Id.* 205 U.S.App.D.C. at 455, 641 F.2d at 945. The Court noted that unless Title VII is not limited to disparate treatment and the holding in *Barnes v. Costle,* 183 U.S.App.D.C. 90, 95, 561 F.2d 983, 988 (1977) extended, "an employer could sexually harass a female employee with impunity by carefully stopping short of firing the employee or taking any other tangible actions against her in response to her resistance, thereby creating the impression ... that the employer did not take the ritual of harassment and resistance seriously." *Bundy v. Jackson, supra,* 205 U.S.App.D.C. at 455, 641 F.2d at 945. Other courts have recently held that sexual harassment is a violation of Title VII. *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Cummings v. Walsh Construction Co.,* 561 F.Supp. 872 (S.D.Ga. 1983); *Robson v. Eva's Supermarket, Inc.,* 538 F.Supp. 857 (N.D.Ohio 1982).

The D.C. Human Rights Act, D.C.Code § 1–2501 (1981), provides:

*Intent of Council.* It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, physical handicap, source of income, and place of residence or business.

The legislative history states the reason for enacting what was then Title 34 of the D.C.Rules and Regulations as part of the District of Columbia Code: "Enactment of Title 34's provisions as the Human Rights Act would underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the 'highest priority.' " *Report of the Council of the District of Columbia, Committee on Public Services and Consumer Affairs,* July 5, 1977 at 3. The statute provides a private cause of action for any individual claiming to be aggrieved by an unlawful discriminatory practice. D.C. Code § 1–2556.[20] We believe the analysis in *Bundy* is applicable to the D.C. Human Rights Act in view of its express language and statement of legislative intent, and hold that sexual harassment which creates a discriminatory environment but does not cause an employee loss of any tangible work benefits (e.g., promotion), is nevertheless discrimination in a "term, condition or privilege of employment." *Bundy v. Jackson, supra,* 205 U.S.App.D.C. at 453–54, 641 F.2d at 943–44. Because this is a case of first impression in this court, and to provide guidance to the trial court upon the remand of this case, we set forth the elements of a prima facie case of sexual harassment, and the burdens of production and proof upon the parties. We also discuss the appropriate standards of employer liability.

 *Elements of Prima Facie Case of Sex Harassment.* To establish a prima facie case of sexual harassment under Title VII, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she has been subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) respondeat superior. *Henson v. City of Dundee, supra,* 682 F.2d at 903–04; *Cummings v. Walsh Construction Co., supra,* 561 F.Supp. at 877.[21] The first element may be demonstrated by a simple stipulation of the employee's gender. *Henson v. City of Dundee, supra,* 682 F.2d at 903. As to the second element, "unwelcome" conduct is "conduct ... [which] the employee did not solicit or incite ... and ... the employee regarded ... as undesirable or offensive." *Id.*

 To define "sexual harassment" *Henson* turned to guidelines then recently promulgated by the Equal Employment Opportunity Commission:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such in-

---

**20.** There is no requirement that an employee of a private employer exhaust any administrative remedies before bringing suit. *Williams v. District of Columbia,* 467 A.2d 140, 142 (D.C.1983).

**21.** These elements are an outgrowth of the elements required by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792,

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to establish a prima facie case of racial discrimination based on disparate treatment (as distinguished from cases of disparate impact, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)) in private, non-class actions, Title VII suits.

dividual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (1981). *See also Bundy v. Jackson, supra,* 205 U.S.App. D.C. at 457, 641 F.2d at 947. The District Government has also defined "sexual harassment." Mayor's Order No. 79–89 (May 24, 1979), which required all District of Columbia government agencies to investigate and adjudicate claims of sexual harassment, defined sexual harassment as:

the exercise or attempt to exercise by a person of the authority and power of his or her position to control, influence or affect the career, salary, or job of another employee or prospective employee in exchange for sexual favors. Sexual harassment may include, but is not limited to:

(1) verbal harassment or abuse;

(2) subtle pressure for sexual activity;

(3) unnecessary patting or pinching;

(4) constant brushing against another employee's body;

(5) demanding sexual favors accompanied by implied or overt threat concerning an individual's employment status;

(6) demanding sexual favors accompanied by implied or overt promise of preferential treatment with regard to an individual's employment status.

These guidelines, which are more specific than the EEOC guidelines (though by no means exhaustive), offer assistance to a trial court faced with the question whether the plaintiff has established a prima facie case.

■ That the harassment complained of be based on sex, *Henson, supra,* 682 F.2d at 903, seems obvious if not redundant. "The essence of a disparate treatment claim under Title VII is that an employee is intentionally singled out for adverse treatment on the basis of a prohibited criterion." *Id. Henson* recognized that where a male supervisor [22] makes sexual overtures to a female worker, it is clear that the harassment is based on a prohibited criterion. *Id.* at 904. *See Bundy v. Jackson, supra,* 205 U.S.App.D.C. at 452 n. 7, 641 F.2d at 942 n. 7 ("in each instance the question is one of but for causation, would the complaining employee have suffered the harassment had he or she been of a different gender?"). Where, as in the case before us, evidence is presented that a male, Dean Hill, has engaged in sexually suggestive behavior toward a female, Dr. Best, and toward no one else,[23] this element, will be sufficiently demonstrated for purposes of the plaintiff's burden to establish a prima facie case.[24]

■ The harassment complained of must affect a "term, condition, or privilege of employment." *Bundy v. Jackson, supra.* "For sexual harassment to state a claim under Title VII, it must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working

**22.** Whether the person engaging in harassing behavior is a supervisor or co-employee is relevant to the determination of employer liability. See discussion *infra.*

**23.** That no other female employees were subject to Dean Hill's sexual advances is irrelevant. "The protections afforded by Title VII against sex discrimination are extended to the individual and 'a single instance of discrimination may form the basis of a private suit.'" *Barnes v. Costle, supra,* 183 U.S.App.D.C. at 100, 561 F.2d at 993 (citations omitted).

**24.** We disagree with the principle propounded in *Henson, supra,* that if sexual overtures made to a female employee are equally offensive to employees of both sexes, no cause of action will lie because the sexual harassment is not based on sex (but rather both men and women are then subject to like treatment). 682 F.2d at 904. Behavior directed at a female employee is no less based on her sex simply because it may be egregious enough to arouse the disgust of male employees who are not themselves subject to sexual behavior directed at them. In fact, proof that sexual harassment which, although directed at a female employee, offends male employees as well, may bolster the plaintiff's claim that the behavior is offensive. In the instant case, such evidence was offered by Dr. Best through Captain Bosdekian's testimony, discussed below.

environment." *Henson, supra,* 682 F.2d at 904. More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case.[25] *Katz v. Dole, supra,* 709 F.2d at 256; *Equal Employment Opportunity Commission v. Murphy Motor Freight Lines,* 488 F.Supp. 381, 385 (D.Minn.1980). Whether the work environment has been rendered abusive or offensive depends upon the plaintiff's showing her psychological well-being has been detrimentally affected. *Henson v. City of Dundee, supra,* 682 F.2d at 904; *Cummings v. Walsh Construction, supra,* 561 F.Supp. at 877. In effect, this is a requirement that the plaintiff show some emotional damages as a result of the harassment. *Id.; see Bundy v. Jackson, supra,* 205 U.S.App.D.C. at 454, 641 F.2d at 944 (plaintiff demonstrated anxiety and debilitation); *Robson v. Eva's Supermarket, Inc., supra,* 538 F.Supp. at 861 (plaintiff demonstrated she was intimidated by harassment and feared harasser). *But see infra* note 30 (discussion points out that level of severity of acts and injury lower to prove statutory claim than to prove common law tort of intentional inflic-

tion of emotional distress). The issue is whether the work environment has been poisoned by sexual insults and demeaning propositions. *Bundy v. Jackson, supra,* 205 U.S.App.D.C. at 453, 641 F.2d at 943. No specific number of incidents, and no specific level of egregiousness, can be set forth; nor is the fact that each incident may not be individually actionable determinative. Instead, the trier of fact must consider the totality of the circumstances, *Henson, supra,* 682 F.2d at 904 (*accord* 29 C.F.R. § 1604.11(b)), keeping in mind that " 'there are cases in which the extreme and outrageous nature of the conduct arises not so much from what is done as from the abuse by the defendant of a relationship with the plaintiff which gives him power to damage the plaintiff's interests.' " *Lucas v. Brown & Root, Inc.,* 736 F.2d 1202 (8th Cir.1984) (quoting *M.B.M. Co. v. Counce,* 268 Ark. 269, 281, 596 S.W.2d 681, 688 (1980).[26] This standard, which employs a balancing test including factors such as the amount and nature of the conduct, the plaintiff's response, and the relationship between the plaintiff and the harassing

**25.** That alleged instances of sexual harassment are isolated or trivial must be demonstrated by the defendant, as a matter in defense against the plaintiff's prima facie case. *Katz v. Dole,* 709 F.2d at 256. The defendant's burden of demonstrating such matters will be discussed in the section on employer liability, *infra.*

**26.** The context of the quotation from *Lucas, supra,* was a discussion whether Ms. Lucas stated a cause of action for intentional infliction of emotional distress where she alleged she had been fired for refusing to sleep with her foreman. The elements of this intentional tort, under Arkansas law, are substantially in accord with the elements of the tort under District of Columbia law. In Arkansas the elements are: (1) extreme and outrageous conduct, (2) willfully or wantonly performed, (3) which caused severe emotional distress. *Orlando v. Alamo,* 646 F.2d 1288, 1290 (8th Cir.1981). In the District, the tort consists of (1) extreme and outrageous conduct, (2) which intentionally or recklessly (3) causes severe emotional distress. *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.1982). In citing this quotation from *Counce, supra,* we do not intend to imply that to prevail a plaintiff in a sexual harassment suit

must demonstrate that the defendant's act meets the requisite standard of the intentional tort (i.e., acts giving rise to liability must be "beyond all of the bounds of decency," *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980)). While acts constituting sexual harassment may also give rise to a claim for intentional infliction of emotional distress (and plaintiff has so pleaded, see discussion *infra* ), *Rogers v. Loews L'Enfant Plaza Hotel,* 526 F.Supp. 523 (D.D.C.1981); *Robson v. Eva's Supermarket, Inc., supra,* 538 F.Supp. 857, we do not believe that the broad purposes of the D.C.Human Rights Act to eradicate all forms of employment discrimination, D.C.Code § 1–2501, would be served by requiring this same high standard for actions alleged to be sexual harassment. There is evidence that men and women have different perceptions of what behavior is harmless or innocent as opposed to that which is offensive. *See* Comment, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 Harv.L.Rev. 1449 (1984). The test to determine whether action legally constitutes sexual harassment is, in effect, a balancing test, recognizing that a hostile or intimidating environment results from various combinations of frequency and offensiveness of behavior.

party, allows the jury to determine, as the representative of the larger community, on a case by case basis, the behavior which the values and norms of the community, as only generally expressed in the D.C. Statute, will not tolerate.

Thus, we hold that a plaintiff establishes a prima facie case of sexual harassment upon demonstrating that unwelcome verbal and/or physical advances of a sexual nature were directed at him/her in the workplace, resulting in a hostile or abusive working environment. *Katz v. Dole, supra,* 709 F.2d 251; *Bundy v. Jackson, supra,* 205 U.S.App.D.C. 444, 641 F.2d 934; *Continental Can Co., Inc. v. State,* 297 N.W.2d 241 (Minn.1980). The test to determine whether the plaintiff has met her burden is essentially a balancing test, in which the trier of fact should consider, *inter alia,* the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff. In other words, the totality of the circumstances must be considered.[27] We now turn to the record before us, which, we hold, establishes a prima facie case of sexual harassment by Dean Hill against Dr. Best.

Dr. Best, the only female faculty member in the College of Pharmacy, recounted numerous instances of unwanted physical harassment and verbal propositions by Dean Hill. For example, in October 1977, Dr. Best and other members of the Howard University Department of Pharmacy Practice attended a meeting of the American Association of Colleges of Pharmacy in Silver Spring, Maryland, with faculty from eight states. While Dr. Best was talking to a colleague, Dean Hill approached her, put his arms around her, and massaged her neck; when she told him to take his hands off her, he laughed. This incident was corroborated by Captain Bosdekian, who further testified that he

found such conduct unprofessional and embarrassing. In February 1978, during a faculty meeting, Dean Hill whispered to Dr. Best that "if you keep dressing this way you are going to be raped"; in January 1978, at a reception he had "toyed" with the fur and jewelry she was wearing, and then sat down at a table with Dr. Best and some colleagues, saying "I see what I want and she is wearing," describing her clothing. In May 1978 at the senior class party Dean Hill threw his arms around Dr. Best's shoulders and patted her behind. Additionally, after she was the only full-time faculty member not invited to the College's anniversary celebration, Dean Hill asked her to go to lunch with him so he could "get [her] drunk and importune" her. Dr. Best also presented sufficient evidence that she repeatedly informed Dean Hill that she disliked and was offended by his advances and that he was aware of her dislike of his behavior.

That Dr. Best was subject to such physical and verbal harassment was corroborated by Professor Harris, a member of the Department of Pharmacy Practice, who saw Dean Hill make a "male-female type grab" of Dr. Best and heard Dr. Best, who was adamant, tell him to take his hands off of her. Captain Bosdekian witnessed the incident in Silver Spring and testified that he regularly saw Dean Hill touch Dr. Best, who would withdraw from such physical contact. Captain Bosdekian also testified that no other female staff members were touched by Dean Hill. Ralph Arline, a former instructor of pharmacy, also witnessed the incident in Silver Spring, which he characterized as more than friendly, testifying that Dr. Best appeared very embarrassed and concerned, and that he was also chagrined by it; there were other incidents as well although the details were hazy in his mind.

---

**27.** The plaintiff's initial burden of proof is that applied in any civil case: whether the plaintiff has introduced sufficient evidence from which the trier of fact could, viewing the evidence in

the light most favorable to the plaintiff, find the necessary elements of the plaintiff's case. *Marshall v. District of Columbia,* 391 A.2d 1374 (D.C.1978).

There was also evidence of the toll this behavior took on Dr. Best. For example, her physician, Dr. Henry, testified that when he began treating her in March 1977 for a thyroid problem (several months before Dean Hill assumed his position), her blood pressure was normal, but in April 1978 (approximately six months after Dean Hill assumed his position) Dr. Henry had to treat her for high blood pressure. Seven months later he hospitalized her for high blood pressure and put her on medication. In response to a hypothetical question, Dr. Henry expressed his expert medical opinion that the harassment to which Dr. Best was subject could cause stress elevating her blood pressure. Dr. Best testified that she was still being treated and that she underwent some counseling in December 1978 and in 1980.

We hold that Dr. Best stated a cause of action and presented a prima facie case of sexual harassment under the D.C. Human Rights Act, D.C.Code § 1–2512, and remand the case for a new trial. *Katz v. Dole, supra,* 709 F.2d 251 (female air traffic controller who was object of sustained and non-trivial harassment, including use of obscenities, and reference to her sexual abilities, which actions were corroborated by witnesses, proved sexual harassment under Title VII); *Continental Can Co., Inc. v. State, supra,* 297 N.W.2d 241 (plaintiff who was subject to male co-workers' comments that based on their sexual prowess she would leave her husband, that women who worked at factory were tramps, and who was grabbed between her legs, demonstrated sexual harassment under Minnesota Human Rights Act).

■ *Liability of Howard University.* We turn now to Howard University's liability for the actions of Dean Hill. Courts have taken two approaches to employer liability for the acts of their employees in sexually harassing other employees. One

approach, recognized in the EEOC guidelines, 29 C.F.R. § 1604.11(c), imposes strict liability when the harassing misconduct is committed by the plaintiff's supervisor. *See Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979), which held the employer responsible where "the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy." *Bundy v. Jackson, supra,* suggested this standard when it cited the EEOC guidelines and held that "an employer is liable for discriminatory acts committed by supervising personnel." 205 U.S. App.D.C. at 453, 457, 641 F.2d at 943, 947. *See also Cummings v. Walsh Construction Co., supra,* 561 F.Supp. at 878; *Robson v. Eva's Supermarket, Inc., supra,* 438 F.Supp. at 863 (employer liable where supervisor of plaintiff acquiesced in sexual harassment by co-employee). A strict liability standard relieves the plaintiff from the burden of demonstrating that personnel above her supervisor knew of and failed to investigate, or otherwise acquiesced in, sexual harassment. EEOC guidelines, 29 C.F.R. § 1604.11(c) (employer is liable for acts of supervisory personnel "regardless of whether the employer knew or should have known of their occurrence").

The second approach, which narrows the scope of employer liability, holds an employer liable for an abusive environment only if "the plaintiff ... prove[s] that higher management knew or should have known of the sexual harassment." *Henson v. City of Dundee, supra,* 682 F.2d at 910. *In Katz v. Dole, supra,* the plaintiff was required to demonstrate "not only that the employer knew or should have known of the existence of a sexually hostile working environment," but also that the employer "took no prompt and adequate remedial action." 709 F.2d at 256.[28] Other courts

---

**28.** *Katz* does suggest this narrower approach would not apply where the harassing party is a "proprietor, partner or corporate officer." 709 F.2d at 255. Apparently this excludes supervisory personnel as this narrow standard was imposed on Katz despite the evidence that supervisory personnel harassed her. *Id.* at 254.

employ this narrower standard of employer liability only where the acts complained of are committed by co-employees, rather than supervisory personnel.[29] *Continental Can Co. v. State, supra,* 297 N.W.2d at 249 (where harassment by fellow employee, employer liable if he knew or should have known of conduct and failed to take timely and appropriate action).[30] The EEOC guidelines take the same approach. 29 C.F.R. § 1604.11(d).

We need not decide what standard to apply when the plaintiff is harassed by co-employees rather than supervisory personnel because on the record before us Dean Hill was the agent of the University and possessed and exercised the power and authority to terminate Dr. Best on behalf of the University. *Cf. Collins v. Barner,* 50 App.D.C. 109, 268 Fed. 699 (1920) (employee acting as vice-principal). The Articles of Organization for the College of Pharmacy and Pharamacal Sciences provide that the Dean "is directly responsible to the Vice President for Health Affairs and serves as agent for the observance and execution of the rules and regulations of the University and of the College." Article IV (Plaintiff's Exhibit 20). The definition of "employer" under the D.C. Human Rights Act supports this interpretation of the evidence. D.C.Code § 1–2502(10) defines employer to include "any person acting in the interest of such employer, directly or indirectly." Dean Hill testified (at the first trial) that he made the decision not to renew or continue Dr. Best's employment and did so without consulting the Committee on Faculty Appointment, Promotion and Tenure (Articles of Organization § VI(a)(ii) (Plaintiff's Exhibit 20)). There

was also testimony from Dr. Alexis that, although the custom and practice at the University regarding tenure decisions was to send the recommendation to the college dean, to Dr. Alexis, and then to the President, who would decide whether to submit his recommendation for decision by the Board of Trustees, this was not done in Dr. Best's case because there was no recommendation for tenure by Dean Hill. In effect, Dr. Alexis simply adopted Dean Hill's recommendation of non-renewal and hence no tenure. Dr. Alexis, in his deposition, which is part of the record on appeal, stated that, in the case of department chairs, such as Dr. Best, the tenure recommendation was made by the dean. An aide to former Dean Robinson also testified that, as a general matter, chairs of departments at the University are directly responsible to their deans, and answerable to them. Further, Dean Hill testified that he made the decision not to continue Dr. Best's employment; his deposition, which is also part of the record, demonstrates that he had sole authority to recommend Dr. Best's reappointment to the University, and that his decision not to reappoint her was based on his personal evaluation of her, without reference to objective criteria.

■ There can be no doubt, then, that the college dean had a critical role in personnel affairs and as the evidence indicates, Dean Hill used his role, with the full knowledge of and acceptance by, the University, to make the final decision not to renew Dr. Best's contract. *Miller v. Bank of America, supra,* 600 F.2d at 213. Accordingly, upon plaintiff's establishing a case of sexual harassment at a new trial,[31] the jury should be instructed that the Uni-

**29.** Whether the harassing party is a supervisor or only a co-employee is generally a question of fact. *Robson v. Eva's Supermarket, supra.*

**30.** The court indicated the standard might be different where supervisory personnel are involved. "It is unnecessary in this case to decide what theory of liability is appropriate when the employer's agents and supervisors are the source of ... sexual harassment." *Id.* at 249 n. 5.

**31.** The burden on the defendant(s) is a burden of production: the defendant(s) must produce admissible evidence which would allow the trier of fact rationally to conclude that the defense has been established and the plaintiff's prima facie case rebutted. *Greater Washington Business Center v. D.C. Comm'n on Human Rights,* 454 A.2d 1333 (D.C.1982). The ultimate burden of proof remains with the plaintiff. *Id.*

versity is to be held liable for such harassment.

*Equal Pay.* Dr. Best also claimed she was discriminatorily paid less than her predecessors and successors as dean and department chair in violation of the D.C. Human Rights Act, D.C.Code § 1–2512, which makes it an unlawful discriminatory practice to "discriminate against any individual, with respect to his compensation." Upon review of the record, we agree with the trial court that Dr. Best failed to so demonstrate, but because we disagree with the reasons given by the trial court, we discuss our findings further below.

 As with Dr. Best's claim of sexual harassment, we have looked to federal law for instruction. The prima facie elements of a claim of unequal pay for equal work are the same under Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1).[32] A plaintiff who alleges that she was unlawfully paid less than a man must establish that the "employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (citations omitted). *Laffey v. Northwest Airlines,* 185 U.S.App.D.C. 322, 338, 567 F.2d 429, 445 (1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). The phrase "equal work" does not require that the jobs be identical, but only that they be "substantially equal." *Corning Glass Works, supra,* 417 U.S. at 203 n. 24, 94 S.Ct. at 2232

n. 24; *Laffey v. Northwest Airlines, supra,* 185 U.S.App.D.C. at 342, 567 F.2d at 449; *Pearce v. Wichita County, City of Wichita Falls, Texas, Hospital Bd.,* 590 F.2d 128, 133 (5th Cir.1979). Skill includes consideration of such factors as experience, training, education and ability. *Pearce, supra,* 590 F.2d at 133 (citing 29 C.F.R. § 800.125 (1975). Responsibility involves the degree of accountability required in the performance of the job; the controlling factor is not job title but job content—"the actual duties that the respective employees are called upon to perform." *Pearce, supra,* 590 F.2d at 133. *Accord Di Salvo v. Chamber of Commerce of Greater Kansas City,* 568 F.2d 593, 596 (8th Cir.1978).

Dr. Best's testimony and exhibits demonstrated that in 1976–77 when she served as Acting Dean and full professor, her salary was $35,840, while the salary of her predecessor, Dean Robinson, had been $39,025.25 in 1974–75 (Plaintiff's Exhibit 62). Dr. Best also testified that a 1978 study of department faculty salaries revealed the salary range in her department to be $31,-000–$36,000 with an average salary of $33,-000; this was corroborated by Dean Hill. In contrast, Dr. Best's salary as a professor in 1978 was $29,000; she received a $1500 stipend for serving as department chair and another $2500 stipend as acting dean. Her total salary, however, remained less than Dean Robinson's, and less than that of the man who replaced her as a professor and department chair. She testified her successor received $46,000; Dean Hill testified that her successor earned approximately $40,000. On cross-examination Dr. Best testified that she negotiated

**32.** 29 U.S.C. § 206(d)(1) provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under

similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

her salary with Dean Robinson, and did not request additional sums for serving as dean or department chair. The trial court ruled that while there was evidence that the men were paid more than Dr. Best, there was no evidence of sexual bias, and dismissed her claim, relying on her testimony that she negotiated her own salary and never asked for as much money as anyone else.

The trial court erred in ruling that the evidence that Dr. Best negotiated her salary with her employer was fatal to her claim of sex discrimination in compensation. An employer cannot negotiate away an employee's statutory rights to equal pay. *Laffey v. Northwest Airlines, Inc.*, 185 U.S.App.D.C. at 340, 567 F.2d at 447. Nevertheless, we affirm the trial court's directed verdict against Dr. Best because we find, upon this record, that crucial elements of a prima facie case are missing. The record does not, for example, include evidence of the comparative duties and skills of former and successor deans and chairs as contrasted to those of Dr. Best; nor was there any comparison of her education, experience, training and ability, with that of the other faculty members, deans and department chairs. She also presented no evidence of her teaching responsibilities, such as the number of courses or students, or the difficulty of her courses, compared to the teaching responsibility of her male colleagues. There is thus no evidence on which the jury could have determined that Dr. Best was performing "equal work, on jobs the performance of which requires equal skill, effort and responsibility." *Corning Glass Works, supra;* see *Pearce, supra* (female credit manager who presented evidence that her successor, a male, earned more when he started than she did when she was fired, although she had 20 years experience and a high school degree while he had a high school degree but no experience, established sex bias in pay). We affirm the trial court's dismissal of this claim at the close of Dr. Best's case.

## B. *Intentional Infliction of Emotional Distress*

Dr. Best alleged that Dean Hill interfered with her responsibilities as chair of the Department of Pharmacy Practice and subjected her to the aforementioned pattern of unwanted sexual harassment, and that, taken together, this conduct constituted intentional infliction of emotional distress. After she testified that Dean Hill prevented her from attending workshops, recalled administrative proposals she had submitted to the Board of Trustees, and dismissed faculty members without consulting her the trial court refused to permit any more evidence of the dean's interference with her performance of her duties, ruling that it was irrelevant to a claim of intentional infliction of emotional distress. Thereafter, at the close of plaintiff's case, the trial court ruled that no juror could reasonably find outrageous conduct sufficient to support the cause of action for intentional infliction of emotional distress.

Intentional infliction of emotional distress consists of "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Sere v. Group Hospitalization, Inc., supra* note 26, 443 A.2d at 37 (citations omitted). Intent or recklessness can be inferred from the outrageousness of the acts. *Id.; Anderson v. Prease*, 445 A.2d 612, 613 (D.C.1982). A plaintiff need not prove actual physical injury. *Waldon v. Covington, supra* note 26, 415 A.2d at 1076. It is for the trial court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, *Sere v. Group Hospitalization, Inc., supra*, 443 A.2d at 38. The case should be submitted to the jury if reasonable people could differ on whether the conduct is extreme and outrageous. *Boyle v. Wenk*, 378 Mass. 592, 392 N.E.2d 1053 (1979); *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 615 (1977) (en banc). We hold

that Dr. Best made out a prima facie case of intentional infliction of emotional distress insofar as she demonstrated repeated "sexual harassment" by the man who was her supervisor. This evidence of a pattern of harassment was sufficient for the jury to find that Dean Hill intentionally and recklessly subjected Dr. Best to outrageous conduct which impaired her health. Creation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress. *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 741, 565 P.2d 1173, 1177 (1977) (en banc) (plaintiff Mexican-American stated cause of action for intentional infliction of emotional distress where he alleged he was subject to his supervisors' and fellow employees' racial slurs). "Repeated harassment ... may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability." *Boyle v. Wenk, supra*, 392 N.E.2d at 1056.

> Changing sensitivity in society alters the acceptability of former terms ... It is for the trier of fact to determine, taking into account changing social conditions and plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage.

*Contreras v. Crown Zellerbach Corp., supra*, 88 Wash.2d at 741–42, 565 P.2d at 1177. *Accord Cummings v. Walsh Construction Co., supra* (allegations of repeated sexual solicitation state cause of action, under Georgia law, for intentional infliction of emotional distress); *Robson v. Eva's Supermarket, supra* (same under Ohio law); *Rogers v. Loew's L'Enfant Plaza Hotel, supra* (District of Columbia law).

■ Actions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress. *Macey v. New York State Electric and Gas Corp.*, 436 N.Y.

S.2d 389, 391, 80 A.D.2d 669 (1981) (where plaintiff alleged defendant refused to turn on her electricity unless she, *inter alia*, separated from her husband, plaintiff stated cause of action for intentional infliction of severe emotional distress because such a condition would be against public policy and would constitute outrageous conduct). The Council of the District of Columbia declared, upon enacting the D.C. Human Rights Act, that "the elimination of discrimination within the District of Columbia should have 'the highest priority.'" *Report of the Council of the District of Columbia, Committee on Public Services and Consumer Affairs, supra* at 3.[33] Recognizing that women suffer sexual harassment in the workplace, based on outmoded sexual sterotypes and male domination of subordinate female employees, we reject the view, articulated by the trial court, that, as a matter of law, the degrading and humiliating behavior herein detailed was at worse a "social impropriety" which did not amount to intentional infliction of emotional distress.

■ We reject Dr. Best's contention that Dean Hill's alleged interference with her professional responsibilities as department chair was also evidence of intentional infliction of emotional distress. To be actionable, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Jackson v. District of Columbia*, 412 A.2d 948, 957 (D.C.1980) (quoting RESTATEMENT (SECOND) OF TORTS § 46, Comment d (1965)). Dr. Best's evidence demonstrated, at most, that she and Dean Hill disagreed about the administration of her department. Such employer-employee conflicts do not, as a matter of law, rise to the level of outrageous conduct. *Cf. Beidler v. W.R. Grace, Inc.*, 461 F.Supp. 1013, 1016 (E.D.Pa.1978) (on defendant's motion to dismiss, held that plaintiff's averment he was excluded from staff meetings, was never

---

**33.** Additionally, the Mayor of the District of Columbia has made it clear that "the policy of the District of Columbia government prohibits

sexual harassment ... in any form." Mayor's Order No. 79–89.

informed about his job performance and was told a new assistant would replace him, failed to state cause of action for intentional infliction of emotional distress), *aff'd mem.*, 609 F.2d 500 (3d Cir.1979). *See also Wenzer v. Consolidated Rail Corporation*, 464 F.Supp. 643, 650 (E.D.Pa. 1979) (claim that defendants adjusted plaintiff's employment status, which was fully justified by federal statute, does not rise to level of outrageous conduct necessary to recover for intentional infliction of emotional distress), *aff'd mem.*, 612 F.2d 576 (3d Cir.1979). The trial court did not err in excluding further testimony on this point, nor in ruling that the alleged interference did not state a claim of intentional infliction of emotional distress.

 Dr. Best also sought to hold the University liable for Dean Hill's alleged intentional tort. An employer may be held liable for the intentional tort of its employee if the tort arises out of the employment. *District Certified TV Service, Inc. v. Neary*, 122 U.S.App.D.C. 21, 22, 350 F.2d 998, 999 (1965). Courts will impute liability to the master (employer)

> when the agent is engaged in the work that its principal has employed or directed him to do and ... in the effort to accomplish it. When such conduct comes within the description that constitutes an actionable wrong, the corporation principal, ... is liable not only for 'the act itself, *but for the ways and means employed in the performance thereof.*'

*Penn Central Transp. Co. v. Reddick*, 398 A.2d 27, 31 (D.C.1979) (quoting *Lyon v. Carey*, 174 U.S.App.D.C. 422, 426, 533 F.2d 649, 653 (1976) (emphasis in original). Liability may be extended to situations "where the employment provides a 'peculiar opportunity and ... incentive for'" the tortious activity. *Penn Central Transp. Co. v. Reddick, supra*, 398 A.2d at 31 (citations omitted). The critical question is whether the conduct "was foreseeable as being within the range of responsibilities entrusted to the employee." *Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C.1981). Thus, in assault cases, it has been held that the master may be liable for an assault arising out of and committed in the course of employment even though the assault is motivated in part by passion, savagery or personal revenge. *Lyon v. Carey, supra*, 174 U.S.App.D.C. at 427, 533 F.2d at 654.[34]

 The evidence before the trial court demonstrated that many of the incidents of alleged sexual harassment occurred during faculty, administrative or other professional meetings attended by Dean Hill and Dr. Best in their professional capacities. The jury could reasonably have found that Dean Hill's actions, if they constituted intentional infliction of emotional distress, arose out of and in the course of employment, thereby subjecting the University to liability.[35]

To summarize: we reverse the trial court's directed verdict for all defendants, at the close of Dr. Best's case, on her claim of intentional infliction of emotional dis-

---

**34.** Whether an assault was within the scope of employment is generally a question of fact for the jury. *Penn Central Transp. Co. v. Reddick, supra*, 398 A.2d at 31.

**35.** The common law absolved a master of liability for one employee's tort against another. 56 C.J.S. *Master & Servant* § 322 (1948). We have found this doctrine cited in only two cases in this jurisdiction. *Collins v. Barnes, supra*, 50 App.D.C. 109, 268 Fed. 699 refused to apply the rule and instead applied a common law exception to the rule, by finding that the alleged co-employee was in fact a vice-principal of the master because he was carrying out his employer's positive instruction. *Hines v. Georgetown Gas Co.*, 3 App.D.C. 369 (1894) noted that the

fellow-servant defense is a matter to be affirmatively pleaded and demonstrated by the defendant. The University did not raise the defense in its answer to Dr. Best's complaint and had no need to present evidence in its defense since the trial court directed a verdict for all defendants at the close of Dr. Best's case. Because we are remanding virtually the entire action between the parties for a new trial, we leave the issues of the University's liability for any intentionally tortious acts by Dean Hill and its waiver of any defenses, by failure to raise them in its pleadings, for further elaboration by the parties, and initial resolution by the trial court. *Scoggins v. Jude*, 419 A.2d 999 (D.C.1980).

tress and remand that issue for a new trial. Whether the sexual harassment allegedly committed was outrageous enough to support the cause of action is for the jury. *Harris v. Jones, supra,* 281 Md. at 615, 380 A.2d at 615. We affirm the trial court's ruling that the evidence of professional disagreements between Dean Hill and Dr. Best, and Dean Hill's actions overruling professional actions undertaken by Dr. Best, did not establish a prima facie case of intentional infliction of emotional distress. *Beidler v. W.R. Grace, Inc. supra; Wenzer v. Consolidated Rail Corp., supra.*

### C. Defamation

In December 1978 the College of Pharmacy Management Committee (of which Dr. Best was a member) received a report about the Department of Pharmacy Practice, prepared by a team of outside consultants who had visited the Department in October 1978 to survey it and report to the Department in advance of a formal accreditation visit scheduled for November 1978. The report was prepared at Dean Hill's request, and discussed a number of problems in the College of Pharmacy, including some faculty opposition to the administration. The report also discussed problems in the Department of Pharmacy Practice, of which Dr. Best was the chair; these problems included a low faculty morale, understaffing, inadequate support staff, and conflicts between the chair and the administration. The report read "the present chairman is actively opposed to the present administration. This lack of cooperation has forced the college administration into leadership activities which more appropriately should have been handled by this department." (Plaintiff's Exhibit 63). The report urged corrective measures, but did not recommend any in particular.

Dr. Best disputed the characterization of her in the report and testified that although she spoke to members of the survey team three times, she never discussed her degree of cooperation because she was not asked. Professor Harris testified that Dr. Best was very cooperative with Dean Hill before and after he became dean, even though he would ignore her at faculty meetings; he acknowledged, as did Dr. Best, however, that there were disagreements between them over the administration of her department but still claimed Dr. Best was not hostile to the administration. Captain Bosdekian also testified that she cooperated with Dean Hill. The Management Committee voted, over Dr. Best's objection, to circulate the report to the faculty after marking each page "confidential." The report was circulated to the faculty. Dr. Best contended that the report's conclusion that she was "actively opposed to the present administration" was defamatory and was circulated outside the University. She testified that at several professional meetings around the country she was told "I understand you can't get along with the dean, that they had to can you"; that after she left Howard University people asked her what had happened that caused her to leave, and that she was not contacted by several universities about job openings. On cross-examination she testified, however, that she did not know who had circulated the report beyond the faculty and could not identify anyone, outside of the faculty, who had seen the report.

The trial court directed a verdict against her on the grounds that the evidence established a qualified privilege; there was insufficient evidence of publication outside of the faculty; and the report was not defamatory on its face and Dr. Best had not proved a defamatory meaning. We affirm on the grounds that the report was not demonstrated to be defamatory and there was insufficient evidence of publication.[36]

▪▪▪ A publication is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."

---

**36.** Because we agree with the trial court that the report was not defamatory, we need not determine the existence of a qualified privilege to defame. *Levy v. American Mutual Liability Insurance Co.,* 196 A.2d 475, 477 (D.C.1964).

*McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 540 F.Supp. 1252, 1254 (D.D.C. 1982) (quoting *Olinger v. American Savings and Loan Ass'n,* 133 U.S.App.D.C. 107, 109, 409 F.2d 142, 144 (1969)). But an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear "odious, infamous, or ridiculous." *Johnson v. Johnson Publishing Co.,* 271 A.2d 696, 697 (D.C.1970). The trial judge has the responsibility to determine whether the statements in question are capable of carrying a defamatory meaning; only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense, can it rule as a matter of law that it was not libelous. *Levy v. American Mutual Liability Ins. Co.,* supra note 36, 196 A.2d at 476; *Sullivan v. Meyer,* 67 App.D.C. 228, 91 F.2d 301 (1937). The plaintiff has the burden of proving the defamatory nature of the publication, *Levy v. American Mutual Liability Ins. Co.,* supra note 36, 196 A.2d at 476, and the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it was addressed. *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App.D.C. 70, 76, 366 F.2d 649, 655 (1966) (en banc). In *Levy, supra* note 36, 196 A.2d at 476–77, the court held that a defendant's false statement, that it had declined to renew the policy of plaintiff, its former insured, due to "loss frequency" was not capable of defamatory meaning; at worst the words implied only that Levy was accident prone and hence a bad insurance risk. In *McBride v. Merrell Dow and Pharmaceuticals, supra,* the District Court ruled that an article asserting that plaintiff, who served as an expert witness and had testified about the hazards of certain drugs, and was paid substantially more than witnesses who testified for the defendant drug company, was not capable of a defamatory meaning. 540 F.Supp. at 1255–56.

■ Although Dr. Best testified that people outside of Howard University had heard she did not get along well with Dean Hill and was leaving the University before she had left, she did not testify to any defamatory meaning attached by anyone to the contents of the report. At best, others only reiterated the words contained in the report. But those words are not defamatory on their face. *Compare Washington Annapolis Hotel Co. v. Riddle,* 83 U.S. App.D.C. 288, 171 F.2d 732, 736 (1948) (imputation of crime is defamatory) *with Sullivan v. Meyer, supra,* 67 U.S.App.D.C. 228, 91 F.2d 301 (article portraying plaintiff as engaging in "farcical" campaign to prevent students from learning about Russia not defamatory). That people outside of the faculty committee knew the contents of the report does not establish that the report itself made her appear "odious, infamous or ridiculous." *Johnson v. Johnson Publishing Co., supra,* 271 A.2d at 697.

■ Even if we were to disagree with the trial court that Dr. Best did not offer any evidence of defamatory meaning, we would affirm the dismissal of the claim on the ground there was insufficient evidence of publication. Dr. Best testified only that she was asked, at various professional meetings, by unnamed persons, about her inability to get along with Dean Hill (who was not named in the report, which referred not to the dean, but to the administration) and about the status of her litigation against the University (which was not in the report at all). Thus, her evidence failed to identify anyone who received or circulated the report and to establish that the contents of the report were otherwise circulated. Because Dr. Best's evidence failed to identify a single person who received or read the report outside of the University, and because she also failed to establish any defamatory meaning, she failed to meet her burden of proving publication. *Greenya v. George Washington University,* 167 U.S.App.D.C. 379, 386, 512 F.2d 556, 563, *cert. denied,* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975).

In conclusion, we reverse and remand this case for retrial of Dr. Best's claim of indefinite tenure, sex discrimination based on sexual harassment, and intentional infliction of emotional distress. We affirm the trial court's finding there was a breach of contract by the University in failing to give Dr. Best timely notice of non-renewal of her appointment, and further affirm its directed verdict for the University on Dr. Best's claims of sex discrimination in compensation, and defamation.

*Appendix*

The following provisions of the Faculty Handbook (as modified February 1, 1969) are referred to in the opinion.

Academic Tenure Regulations

SECTION I: CLASSES OF ACADEMIC POSITIONS: Academic positions are those where the principal services performed by the holders of said positions are teaching, independent research, or a combination of either of these with related professional services, approved by the University.

A. Regular: Professor, Associate Professor, Assistant Professor, and Instructor (except as provided in B, C, and D below).

B. Special:

1. All other academic positions shall be considered special. They include:

a. The positions of Visiting Professor, Lecturer, Temporary Term Appointments, and others of like nature.

b. The positions of Teaching Assistant, Research Associate, Graduate Assistant, Research Assistant, and Student Assistant.

c. Summer School positions, whatever the titles thereof may be.

d. Part-time positions, whatever the titles thereof may be, except as otherwise designated by the Board of Trustees in individual cases.

e. Positions, whatever the title may be, held in connection with experimental or temporary programs or institutes.

f. The positions of appointees with specialized functions, such as a Professor of Military Science.

2. The paragraphs above covering certain types of special positions are merely illustrative and do not purport to constitute a complete listing of such positions.

3. No number of reappointments to any special position or any term positions shall create a presumption of a right to reappointment.

C. Emeritus; Professor and Associate Professor.

SECTION II: NON–ACADEMIC POSITIONS: The administrative functions, titles and status of such administrators of academic services as deans, vice deans, associate deans, and assistant deans of schools or colleges, directors, department heads or chairmen, shall be distinct from their functions, titles and status, if any, as holders of academic positions.

SECTION III: TYPES OF APPOINTMENTS: The following principles, standards, and procedures shall apply with regard to appointments and reappointments.

A. STATEMENTS OF TERMS AND CONDITIONS

1. The precise terms and conditions of every appointment to the faculty will be stated to the applicant in writing by the President of the University, or his delegate. An appointment will be consummated upon receipt by the President, or his delegate, of a letter of acceptance within the period stated in the letter of appointment. The offer of an appointment shall be made null and void unless it is accepted by the applicant within the time stated in the letter of appointment, or by revocation of the offer by the University by mailing notice of same to the applicant prior to receipt of his acceptance.

2. Notice of promotion and other changes in terms and conditions of service shall be given by the University as promptly as possible.

B. SPECIAL CLASSES OF ACADEMIC POSITIONS

Appointments to the special classes are normally made for a period of one year, but exceptions to this rule may be recommended under special circumstances. Such appointments are subject to renewal, but there should be no presumption of renewal.

## C. REGULAR CLASSES OF ACADEMIC POSITIONS

1. With the exception of temporary appointments for specifically limited terms, all full-time appointments will be of two kinds: (1) probationary appointments, and (2) appointments with indefinite tenure.

2. Probationary appointments may be for one year, or for other stated periods, subject to renewal; but the total number of years on such probationary appointments shall not exceed seven, except that a faculty member with previous full-time service of three years or more at another institution may be required as a term or condition of his initial appointment as stated in the letter of appointment to serve a probationary period not to exceed four years, even though his total probationary period in the academic profession is thereby extended beyond seven years. Leaves of absence to engage in authorized teaching of research activities at another institution of higher learning shall be included in the total probationary period of seven years. Leaves of absence for study toward a degree, military or other national services, or for personal affairs will not be included in the calculation of this period.

Subject to the provisions below, a regular full-time member of the faculty shall be notified in writing on or before June 30, preceding his final (i.e. maximum), probationary year that he will be granted indefinite tenure or that his regular full-time service will be terminated at the completion of that year.

3. Stated Periods by Rank:

a. Instructors shall be appointed for a period of one year. The instructor shall be given, upon reappointment in the rank, a succeeding reappointment or succeeding reappointments of two years each (provided that such reappointments do not extend the total probationary period beyond seven years).

b. Assistant Professors will be appointed for a period of two years, and will be eligible for reappointment for subsequent two-year periods (provided that such reappointments do not extend the total probationary period beyond seven years). In exceptional cases Assistant Professors may be considered for indefinite tenure, which shall be determined by criteria established by each school or college.

c. Associate Professors and Professors shall be appointed with indefinite tenure, except that an Associate Professor or Professor without previous appointment at the University shall be appointed for a period of three years. If reappointed, he will be given indefinite tenure. In exceptional cases, a new appointee to the rank of Associate Professor or Professor may be appointed with indefinite tenure.

## D. STANDING COMMITTEE ON TENURE

There shall be a Standing Committee of the Senate on Tenure with one representative elected regardless of rank or tenure from each of the several schools and colleges, charged with the responsibility of reviewing tenure regulations, studying policy regulations from other schools and colleges, and recommending to the University Steering Committee such revisions as appear necessary.

## SECTION IV: PROMOTION

A. Promotion in rank is dependent upon growth in professional competence and is based on such criteria as teaching ability, scholarship, participation and leadership in professional societies, and public and community service to the University at large.

B. Recommendations for promotions are initiated at the Department level by majority vote of the tenured members of the Department, or by an executive committee assigned this responsibility. All faculty members eligible for promotion shall have their credentials evaluated annually.

The Department's decision shall be submitted for consideration to the Dean of the College and to the Chairman of the Committee on Appointments and Promotions of the school or college concerned. Should the Dean's recommendations differ from those of the Committee on Appointments and Promotions, both shall be forwarded to the President of the University for decision. The faculty member or members under consideration for promotion shall be informed as to the disposition of their cases as promptly as possible.

SECTION V: TERMINATION OF SERVICE:

A. Expiration of Definite Period Appointments.

All appointments for a definite period of service (one semester, one, two, or three years), expire automatically with the completion of such period of service.

B. Termination of Probationary Appointments.

1. Notice of Non-Renewal of Probationary Appointments: Written notice that a probationary appointment is not to be renewed will be given to regular full-time faculty members in advance of the expiration of their appointments, according to the following minimum periods of notice:

a. Not later than March 1 of the first academic year of service if the appointment expires at the end of that year; if a one-year appointment terminates during an academic year, at least three months in advance of its termination.

b. Not later than December 15 of the second year of academic service, if the appointment expires at the end of that year; or if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination.

c. At least six months before the expiration of an appointment after two or more years in the institution.

2. If a faculty member on probationary appointment alleges that a decision not to reappoint him is caused by consideration violative of academic freedom, his allegation shall be given preliminary consideration by the Grievance Committee. The faculty member will be responsible for establishing the grounds on which he bases his allegations and the burden of proof will rest on him. If then the committee concludes that there is probable cause for the faculty member's allegations, the matter shall be heard in the manner set forth in Section VI of this Handbook.

3. If a member of the faculty desires to terminate an existing appointment at the end of the academic year, or to decline a renewal in the absence of notice or non-renewal, he shall give notice in writing at the earliest opportunity but not later than April 15; but he may properly request a waiver of this requirement in case of hardship or in a situation where he would otherwise be denied substantial professional advancement.

4. Late Notices of Non-Renewal of Probationary Appointments. If notice of non-renewal of a probationary appointment is given after the dates specified for such notice, the faculty member concerned may request from the appropriate dean a written statement of reasons for non-renewal.